# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

―――――――――――――

No. 94-10122

―――――――――――――

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAIME RAMOS, JOSE ANGEL CASTORENA,
ANDRES RAMOS, ARMANDO ESPINOSA,
and JOSE ALVARO CERVANTES,

Defendants-Appellants.

―――――――――――――

Appeal from the United States District Court
for the Northern District of Texas

―――――――――――――

December 20, 1995

Before POLITZ, Chief Judge, WISDOM and STEWART, Circuit Judges.

POLITZ, Chief Judge:

The five defendants herein appeal their convictions and sentences for various drug and money-laundering offenses. We affirm all convictions. We also affirm all sentences except that imposed on Jaime Ramos which we vacate and remand for resentencing.

## Background

A major Drug Enforcement Administration investigation into drug-trafficking activities centered in the Dallas-Fort Worth area culminated in the return of an indictment and the execution, in the days immediately thereafter, of search and arrest warrants. A

superseding indictment thereafter was returned, charging 16 persons with 56 counts of drug-related and money-laundering counts.

Five of the indictees, Jose Castorena, Jose Cervantes, Armando Espinosa, and the brothers Andres and Jaime Ramos, the appellants herein, were severed and separately tried. The jury returned guilty verdicts against all defendants. Castorena was convicted of conspiracy, continuing criminal enterprise, distribution of cocaine (13 counts), possession of cocaine with intent to distribute (2 counts), maintenance of a place for distribution of cocaine, interstate travel in aid of racketeering, and money laundering (4 counts). Cervantes was convicted of conspiracy, distribution of cocaine (5 counts), and interstate travel in aid of racketeering. Espinosa was convicted of interstate travel in aid of racketeering. Andres Ramos was convicted of conspiracy, distribution of cocaine (4 counts), and maintenance of a place for distribution of cocaine. Jaime Ramos was convicted of conspiracy and distribution of cocaine. Following sentencing hearings the court sentenced Castorena to life imprisonment, Cervantes to 30 years, Espinosa to 5 years, Andres Ramos to 30 years, and Jaime Ramos to 235 months imprisonment. All timely appealed.

Analysis

1.    All defendants

All defendants challenge the trial judge's method of handling an extrinsic and potentially intimidating influence on the jury. Several days into the trial the court became aware that the jury, particularly juror Eckardt, was concerned that they were being followed by a man later identified as Ruben Hernandez. Hernandez was listed as the first witness on Castorena's supplemental witness list.

In the presence of counsel but out of the presence of the rest of the jury, the judge

2

questioned Eckardt and learned that Hernandez had kept the jury under persistent observation, and that other members of the jury were aware of this "stalking." Several other members of the jury had approached a deputy marshal about the matter. Eckardt candidly admitted:

> I want to be honest with you, because I think it is only fair at this point. When I went into this trial, I wasn't biased whatsoever. When people start following me, I will not vote someone guilty if I think it's going to affect my family. If I need to be removed, then I think you need to remove me.

The judge reassured Eckardt and then brought in the rest of the jury and advised them that steps were being taken in the matter. He instructed the jurors that they should not be influenced by any person in the spectator section or outside the courtroom. It was a Friday afternoon and the judge decided to recess for the weekend to permit a cooling-off period.

When trial resumed the following Tuesday, defense counsel expressed concern that Eckardt might have developed a negative attitude toward the defendants. In chambers, in the presence of counsel, the court questioned Eckardt to determine whether she should be replaced. She stated: "I believe that if [the "stalker" incident] doesn't happen again, I can put it behind me." Being advised that no juror in the Northern District of Texas had ever been harmed she expressed relief and stated that she could continue as an impartial juror.

Counsel then moved for Eckardt's removal and replacement with an alternate juror. The motion was denied, as was their request that the judge question the rest of the jury. The court declined, expressing his belief that to do so would unduly emphasize the incident.

There was no further recurrence. Hernandez was not in the courtroom for the balance of the trial. He did not testify, although listed as a witness, because his presence in the courtroom had violated the witness sequestration order. The jury had also suggested the possibility that certain spectators had pointed their hands at the jury. The judge cautioned the audience against such conduct and that did not occur during the remaining weeks of the

3

trial.

Defendants continue to challenge the court's refusal to remove juror Eckardt, but their primary focus is on the court's refusal to conduct a hearing and to question all of the other members of the jury. They maintain that prejudice must be presumed and that the limited hearing was insufficient, denying them due process and warranting a new trial.[1] We must determine whether the hearing was adequate and, if so, whether the finding of no-prejudice was correct.

In **Smith v. Phillips**[2] the Supreme Court held that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." In the hearing the trial judge is to "determine the circumstances, the impact thereof upon the juror, and whether or not [the circumstances were] prejudicial in a _hearing_ with all interested parties permitted to participate."[3] The Court emphasized that the trial judge is to be ever watchful to prevent prejudicial occurrences and to determine the effect of any that do occur.

We do not understand **Smith** to require a full-blown evidentiary hearing in every instance in which an outside influence is brought to bear upon a petit jury.[4] Our precedents allow the trial judge the flexibility, within broadly defined parameters, to handle such situations in the least disruptive manner possible. Although we have not articulated a standard applicable to appellate review of a limited hearing, we have had occasion to speak to the applicable standard of review when the decision of the trial court was to hold no

---

[1] **Remmer v. United States**, 347 U.S. 227 (1954).

[2] 455 U.S. 209 (1982).

[3] **Id.** at 216 (emphasis in original).

[4] See, e.g., **United States v. Martinez-Moncivais**, 14 F.3d 1030 (5th Cir.), cert. denied, _____ U.S. _____, 115 S.Ct. 72, 130 L.Ed.2d 27 (1994).

hearing at all:

> In determining whether to conduct a hearing in a case such as this, the court must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by the misconduct. We, as an appellate tribunal, are in a poor position to evaluate these competing considerations; we have only an insentient record before us. The trial court is in a far better position to judge the mood at trial and the predilections of the jury. The trial court, therefore, must enjoy a broad discretion in these matters.[5]

We perceive no reason why this standard should not apply equally to the review of a trial judge's decision to limit the scope of a hearing. Jury intrusions may range from petty, *de minimis* incidents to outrageous conduct. In granting a broad discretion to the trial judge, we acknowledge and underscore the obvious, that the trial judge is in the best position to evaluate accurately the potential impact of the complained-of outside influence. We therefore hold that the above quoted standard is applicable herein.

The trial judge questioned juror Eckardt extensively, developing the extent of the "stalker's" contact with the jurors and the concerns shared with other jurors. Defense counsel were present during this examination and were allowed to provide input, including proposed questions and suggested methods for enhancing juror safety. Further, both in and out of the jury's presence, the court expressly rejected the notion that the defendants were behind the "stalker's" conduct.

The "stalker" did not communicate directly with any juror. Evaluating this intrusion, the trial judge decided that questioning the other jurors was contraindicated because it would underscore and amplify an otherwise transient and minor event. The judge took additional precautions, determining the "stalker's" identity and excluding him from the courtroom,

---

[5]**United States v. Chiantese**, 582 F.2d 974, 980 (5th Cir. 1978), cert. denied, 441 U.S. 922 (1979).

5

instructing other spectators not to engage in any conduct which might be perceived by the jury as intimidating, informing the jury of their relative safety, and advising them of the importance of proceeding, undisturbed, with the case. The incident occurred at the end of the first week of a five-week trial at which point the evidence adduced related only to the authentication of telephone, pager, and utility records. In light of these circumstances, we perceive no abuse of the broad discretion allowed the district judge when he declined to prolong the hearing and to question the other jurors about the "stalker."

Nor do we perceive error in the trial court's finding of no prejudice. Defendants contend that prejudice should be presumed and that relief should be granted when the reasonable probability of prejudice exists.[6] The government counters that in **United States v. Olano**,[7] the Supreme Court taught that the ultimate inquiry is: "Did the intrusion affect the jury's deliberations and thereby its verdict?"[8]

We find no inconsistency in our precedents and the Supreme Court's teachings in **Smith** and **Olano**. The "stalker" incident gave rise to a reasonable possibility of prejudice. The trial judge responded to this jury-intrusion incident with the chambers questioning of Eckardt, and with assurances and instructions to the jury which we find adequate to dispel that reasonable possibility of prejudice. We therefore conclude that **Olano**'s ultimate inquiry must be answered in the negative.[9]

Defendants next complain about the government's use of exhibits during closing argument. During trial the prosecutor used handwritten summaries of testimony, introduced

---

[6]See, e.g., **Durr v. Cook**, 589 F.2d 891 (5th Cir. 1979).

[7]507 U.S. _____, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

[8]**Id.**, 507 U.S. at _____, 113 S.Ct. at 1780.

[9]See **Paz v. United States**, 462 F.2d 740 (5th Cir.), cert. denied, 414 U.S. 820 (1973).

6

as exhibits, to assist in the presentation of its case. During closing argument the government used printed summaries of the same testimony. Defense counsel objected to the use of these charts as containing matters not in evidence. The objection was overruled but the charge to the jury included the following directions:

> Certain other charts and summaries were shown to you in order to make the other evidence more meaningful and to aid you in considering the evidence. They are no better than the testimony or the documents upon which they are based, and are not themselves independent evidence. Therefore, you are to give no greater consideration to these charts or summaries than you would give to the evidence upon which they are based.

> It is for you to decide whether the charts, schedules or summaries correctly present the information contained in the testimony and in the exhibits on which they were based. You are entitled to consider the charts, schedules and summaries if you find that they are of assistance to you in analyzing the evidence and understanding the evidence.

Defendants maintain that the printed summaries contained information which was not in evidence, and that the jury instruction thereon was not sufficient to cure the error. We are not persuaded. The contents of the printed summaries and the prosecutor's closing argument fall within the wide scope of appropriate argument. The judge's charge put the summaries in proper perspective. This claim lacks merit.

2.    Castorena

Castorena challenges the sufficiency of the evidence in the four money-laundering counts, specifically questioning the evidence of the source of the funds and his intent to conceal their origin.[10] The government was required to prove, beyond a reasonable doubt, that Castorena conducted financial transactions involving proceeds of unlawful activity with the intent to conceal or disguise the nature and source of the proceeds. We view the

---

[10]**United States v. West**, 22 F.3d 586 (5th Cir.), <u>cert</u>. <u>denied</u>, _____ U.S. _____, 115 S.Ct. 584 (1994).

evidence in the light most supportive of the verdict.[11]

The evidence establishes that the bulk of Castorena's income came from drug trafficking. The jury was entitled to infer from this evidence that the sizable sums involved in the transactions were derived from illegal activities.[12] Further, in light of Castorena's methods of handling these funds the jury reasonably could infer that he had the requisite intent to disguise and conceal the nature and source of the funds.[13] The evidence is sufficient to support the convictions.

We next consider whether the trial judge improperly denied Castorena the assistance of counsel by refusing to continue the trial. Castorena was arrested on October 8, 1992 and initially was represented by Tim Evans, Esq. On January 7, 1993 Robert Harris, Esq. was substituted as Castorena's counsel. On July 23, 1993 the trial judge issued an order noting the beginning date and expected length of trial.

On August 11, 1993 Castorena filed a motion to substitute Gerald Goldstein, Esq. as his counsel, informing that Goldstein would not be available for the first week of trial. On August 13, 1993 this motion was denied. Castorena persisted and filed a motion to continue the trial, citing as cause his desire to have Goldstein as his counsel. This motion contained a notice that two other attorneys would be Goldstein's co-counsel. Harris moved to withdraw.

The trial judge denied the continuance. In a well-reasoned memorandum the trial

---

[11]**United States v. Casteneda-Cantu**, 20 F.3d 1325 (5th Cir. 1994).

[12]**United States v. Ramirez**, 954 F.2d 1035 (5th Cir.), cert. denied, 505 U.S. 1211 (1992).

[13]See **United States v. Salazar**, 958 F.2d 1285 (5th Cir.), cert. denied, _____ U.S. _____, 113 S.Ct. 185 (1992).

8

judge noted that under **Wheat v. United States**,[14] Castorena enjoyed a "qualified right to counsel of his choice," but concluded that the Constitution does not bestow upon a criminal defendant the right "to manipulate the orderly administration of justice through the exercise of his choice of counsel." The trial judge then analyzed Castorena's request according to the factors we set out in **Gandy v. Alabama**,[15] making the following findings:

(1)    the requested delay (one week) was not lengthy;

(2)    this was Castorena's third attorney of record, and his notice of appearance indicated that he had two other counsel of record who should be prepared to try the case;

(3)    although not requested by Castorena, case has already been continued twice, and facts indicate Castorena in contact with Goldstein by May 3, 1993, 4 months before trial date;

(4)    continuance would greatly inconvenience Government, which has 91 witnesses prepared for trial date, and court, which has blocked 4 weeks for trial and has another criminal case immediately following this one;

(5)    motion appears to have dilatory motive, based on the fact that Goldstein and Castorena in contact since May; and

(6)    Castorena and defendants have already been detained for eleven months pending trial.

Cynthia Orr, Goldstein's associate, represented Castorena for the first two weeks of trial. The record reflects that she did a very fine job of representing Castorena. Goldstein joined her on October 5, 1993. We find no abuse of discretion in the rulings involving

---

[14]486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

[15]569 F.2d 1318, 1323 (5th Cir. 1978). These factors are:

(1)    the length of the requested delay;
(2)    whether lead counsel has an associate adequately prepared to try the case;
(3)    whether other continuances have been requested and granted;
(4)    the balanced convenience or inconvenience to litigants, witnesses, opposing counsel, and the court;
(5)    whether the requested delay is for a legitimate reason or is dilatory and contrived; and
(6)    whether there are other unique factors present.

9

Castorena's counsel.[16]

3.    Espinosa

Espinosa challenges the sufficiency of the evidence in his conviction for interstate travel in aid of racketeering. To convict, the government had to prove that Espinosa traveled in interstate commerce with the specific intent to engage in or facilitate the illegal conduct set out in 18 U.S.C. § 1952(a)(1)-(3) in furtherance of a criminal business enterprise.[17] It cannot be gainsaid that the drug-trafficking activities involved herein fall within the conduct proscribed by section 1952(a)(3).

The Espinosa indictment arose out of an Oklahoma state trooper's stop of an automobile, driven by Cervantes and in which Espinosa was a passenger. Following a scan by a drug dog, nearly two kilograms of cocaine were seized. The government offered evidence that Espinosa had several dealings with the codefendants, was a passenger in the vehicle containing the two kilos of cocaine, was involved in preparing for the trip, and met with Castorena, Cervantes, and government witness Kevin Milton the night before the trip. A conversation between Espinosa and Cervantes, covertly taped while they were sitting in the state trooper's vehicle, suggests that Espinosa was willing to assist Cervantes in lying to the trooper about their plans in Oklahoma. Milton offered testimony, which the jury obviously credited, that Espinosa had made at least three other trips to Kansas for him, to assist in distributing drugs. The testimony by Milton was a sufficient basis for finding that

---

[16]See **United States v. Barrentine**, 591 F.2d 1069 (5th Cir.) (not an abuse of discretion to deny continuance to defendant who retained new attorney with a scheduling conflict just prior to trial), cert. denied, 444 U.S. 990, 100 S.Ct. 521, 62 L.Ed.2d 419 (1979).

[17]**United States v. Roberson**, 6 F.3d 1088 (5th Cir.), cert. denied, _____ U.S. _____, 114 S.Ct. 1230 (1994).

Espinosa was aware of the cocaine on the trip in question, and a finding that his repeated actions were in furtherance of a criminal business enterprise. The evidence is sufficient to support Espinosa's conviction. We may not look behind credibility assessments made by the jury, particularly in a case where the questioned testimony was subjected to the testing fire of cross-examination.

Nor do we find any error in Espinosa's sentencing; his complaint that the quantity of cocaine was improperly calculated is not persuasive. The record contains adequate proof of the relevant quantity. Nor do we find any validity to Espinosa's claim that he is entitled to be designated as a "minimal" participant. The testimony of Milton undercuts this contention. That others were more culpable does not automatically equate to minimal status for Espinosa.[18]

### 4. Andres Ramos

Andres Ramos challenges the trial court's refusal to admonish the jury to disregard certain testimony of government witness Enrique Soto. An accomplice witness, Onesimo Saenz, testified that he and Soto were shot by an unknown assailant outside Andres Ramos' home. Soto, who testified later, prefaced his version of the story by saying "my friend [Saenz] had some problems with Andres Ramos." Defense counsel objected and the trial judge instructed the prosecutor to move on but declined to admonish the jury.

The prosecutor immediately disclaimed to the jury any intent to suggest that Andres Ramos was responsible for the attack. The matter was not mentioned again during the lengthy trial and during his closing argument the prosecutor affirmed the disclaimer. The trial judge instructed the jury that the defendants "were not on trial for any act, conduct, or

---

[18]**United States v. Morris**, 46 F.3d 410 (5th Cir.), cert. denied, _____ U.S. _____, 115 S.Ct. 2595 (1995).

11

offense not alleged in the indictment."

Andres Ramos claims prejudice from Soto's statement. We do not agree. In light of the transient and elusive nature of the statement, the prosecution's disclaimer, the jury charge, and the overwhelming evidence against Andres Ramos, if there was error in the admission of the statement or in the trial court's declining to instruct the jury to disregard, it decidedly was harmless error.[19]

### 5. Ramos Brothers

The Ramoses challenge a two-point increase in their respective offense levels for possession of firearms.[20] The PSI reports that on March 8, 1992, a government informant saw Castorena and the Ramos brothers express interest in buying a number of firearms, and that six firearms were later seized from Castorena's principal residence. In addition, two pistols, along with 13 grams of cocaine, were found at a residence used for storage of drugs by Andres Ramos and Castorena. The Ramoses challenge the sufficiency of the nexus between these firearms and the offenses of conviction to warrant the two-level increase.[21]

The Ramos brothers were assessed this increase because of their roles in the drug-trafficking conspiracy. It is well established that the government may prove that the defendant personally possessed a weapon by showing a temporal and spatial relationship between the weapon, the proscribed activity, and the defendant.[22] In addition, we previously have held that "one coconspirator may ordinarily be assessed a § 2D1.1(b)(1) increase in

---

[19]**United States v. Zabanek**, 837 F.2d 1249 (5th Cir. 1988).

[20]U.S.S.G. § 2D1.1(b)(1).

[21]U.S.S.G. § 1B1.3(a)(1)(B).

[22]**United States v. Mergerson**, 4 F.3d 337 (5th Cir.), cert. denied, _____ U.S. _____, 114 S.Ct. 1310, 127 L.Ed.2d 660 (1994).

12

view of another coconspirator's possession of a firearm during the drug conspiracy as long as the use of the weapon was reasonably foreseeable."[23]  The record shows that the weapons were connected, largely through Castorena, with the drug-trafficking activity, and that the evidence supporting the Ramos brothers' convictions demonstrate the relationship between them and the drug conspiracy.  The key question thus becomes whether the government demonstrated by a preponderance of the evidence a sufficient nexus between the weapons and the Ramos brothers to justify the enhancement.[24]

In the case of Andres Ramos, we conclude that the government proved a sufficient nexus between his activities and the firearms to warrant the offense level increase.  Two pistols along with cocaine were found in a house used by Andres Ramos to store narcotics, and he was present along with other members of the conspiracy at negotiations to purchase firearms.  These facts show both his constructive possession of the two pistols[25] and that he reasonably could foresee the use of the seized firearms in the course of the conspiracy.[26]  The district court did not err in applying the section 2D1.1(b)(1) enhancement to Andres Ramos'

---

[23]**Id.**, 4 F.3d at 350.

[24]**United States v. Aguilera-Zapata**, 901 F.2d 1209 (5th Cir. 1990).

[25]"In determining possession 'what matters is not ownership but accessibility.'" **United States v. Mitchell**, 31 F.3d 271, 278 (5th Cir.), cert. denied, _____ U.S. _____, 115 S.Ct. 455 (1994) quoting **United States v. Menesses**, 962 F.2d 420, 429 (5th Cir. 1992).

[26]Compare **United States v. Fierro**, 38 F.3d 761 (5th Cir.) (pistol found near cocaine in house to which defendant had access), cert. denied, _____ U.S. _____, 115 S.Ct. 1388, 131 L.Ed.2d 240 (1995); **Mitchell**, supra, (sufficient nexus when coconspirator had weapon twice at house used for drug trafficking); **United States v. Sparks**, 2 F.3d 574 (5th Cir.) (coconspirator's brandishing of weapon made use of weapon in drug conspiracy reasonably foreseeable by other conspirators), cert. denied, _____ U.S. _____, 114 S.Ct. 720, 126 L.Ed.2d 684 (1994).  Such use of firearms is often reasonably foreseeable since "firearms are 'tools of the trade' of those engaged in illegal drug activities." **United States v. Martinez**, 808 F.2d 1050, 1057 (5th Cir.), cert. denied, 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987).

sentence.[27]

We come to a different conclusion, however, regarding the sentence of Jaime Ramos. The government does not claim that Jaime Ramos ever visited the house from which the two pistols were seized; his sole contact with firearms in relation to the drug conspiracy was his presence at the March 8, 1992 meeting. There is no evidence that any firearms were actually purchased at that meeting, or that Jaime Ramos on some other occasion witnessed another member of the conspiracy using or even carrying a firearm. Because the government has not proven that Jaime Ramos even knew of the existence of the seized weapons, we cannot conclude that he reasonably could foresee their use. While there is no doubt that the use of firearms was a significant aspect of this drug conspiracy, that fact alone is insufficient to justify the two-point increase in Jaime Ramos' offense level.

Accordingly, we AFFIRM all convictions and AFFIRM all sentences except that of Jaime Ramos, whose sentence we VACATE and REMAND for resentencing.

---

[27]In addition, the government points out that even if the district court had agreed with Andres Ramos and not applied the two-point increase, his guideline range would have dropped from 42 to 40, Criminal History Category III, producing the same guidelines range of 360 months to life. The trial judge imposed the minimum sentence, 360 months; any error would have been harmless.

14