**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-10755
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,


VERSUS


EDWARD RUBEN SOTELO, ERNEST CASTRO QUINTANA, HENRY ARGUIJO, GARY ARTIAGA, LAWRENCE ANTHONY FLORES, and JOE ANGELO SOTELO, JR.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Texas
_____

October 8, 1996


Before REYNALDO G. GARZA, DeMOSS and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Defendants-Appellants challenge their convictions and sentences relating to a drug trafficking conspiracy. Finding no reversible error, we affirm.

**I. BACKGROUND**

**a. Proceedings in the district court**

Appellants were charged in a twelve-count indictment involving a marijuana and cocaine distribution conspiracy in the Fort Worth, Texas area that began in 1990 and continued through January 19,

1

1995. A jury returned guilty verdicts as to all six appellants on the conspiracy count (Count 1). Henry Arguijo, ("Arguijo") who was named only in the conspiracy count, received a 160 month prison term for his conviction on Court 1.

In addition to the conspiracy conviction, Edward Sotelo was found guilty of continuing criminal enterprise (Count 2), possession of cocaine with intent to distribute (Counts 6 & 10), use of a communication facility to commit a felony (Counts 7, 8 & 9), possession of marijuana with intent to distribute (Count 11) and distribution of cocaine (count 12).[1] He was sentenced to life in prison[2] and given a $50,000 fine.

Joe Sotelo was found guilty of possession of cocaine with intent to distribute (Count 6) as well as the conspiracy conviction. He was also sentenced to life in prison.

Ernest Quintana ("Quintana") was found guilty of possession of cocaine and marijuana with intent to distribute (Counts 10 & 11) in addition to the conspiracy count. He received 151 months in prison.

Lawrence Flores ("Flores") was found guilty of distribution of cocaine (Count 12) and conspiracy. He was sentenced to 235 months

---

[1]Edward Sotelo was acquitted on two counts of distribution of cocaine (Counts 3 & 4) and the district court granted the Government's motion to dismiss one count of possession of cocaine with intent to distribute (count 5).

[2]Concurrent sentences, periods of supervised release and mandatory special assessments were also part of the sentences imposed by the district court. However, because they add unnecessary complexity to the recitation of facts and are not relevant to the issues before this Court, they are not referenced here.

in prison.

Gary Artiaga ("Artiaga") was convicted for using a communication facility to commit a felony (Count 9) and conspiracy. The district court sentenced him to 270 months in prison and a $25,000 fine.

**b. Facts**

From 1988 to 1992 Edward Sotelo worked for Arguijo, delivering cocaine purchases ordered from Arguijo. Beginning in early 1992, purchasers begin ordering cocaine directly from Edward Sotelo. Although Edward Sotelo still did drug business with Arguijo, it appears that they were peers or that Arguijo began working for Edward Sotelo after 1992. Twelve narcotics offenders and numerous law enforcement officers testified at trial about the general operation of the Sotelo drug business and the following specific incidents.

Video surveillance on a warehouse leased by Artiaga revealed little traffic, but included visits by Edward Sotelo, Artiaga, Flores. A video tape was introduced at trial showing Edward Sotelo, Flores and Government witness Troy Williams at the warehouse. Williams, who purchased 60-70 kilograms from the Sotelo organization between 1991 and 1994, testified that he sometimes picked up his cocaine from the warehouse. Williams also testified concerning drug deals with Artiaga, Flores and Joe Sotelo.

Appellants' codefendant Eric Bryant pleaded guilty to drug charges and testified at trial about his eight-year history as a drug customer of the Sotelo drug organization. He normally

purchased cocaine in kilogram quantities, cooked it into crack and sold the crack. On June 2, 1994, police intercepted telephone conversations from Edward Sotelo's residence in which Edward Sotelo set up a two-kilogram cocaine transaction. Joe Sotelo then delivered approximately a kilogram of cocaine to Eric Bryant in a cereal box. Police, who had been watching the transaction, stopped Bryant shortly after the transaction and recovered the box of cocaine.

Kevin Blevins, another Government witness, began purchasing drugs from Edward Sotelo and Quintana in 1993. At first he bought large amounts of marijuana and small amounts of cocaine, but later increased his cocaine purchases to kilogram quantities. In August 1994, Blevins was arrested. During the arrest Edward Sotelo paged him several times. Blevins agreed to answer the page and set up a drug buy from Edward Sotelo. An undercover policeman went with Blevins to the buy. Edward Sotelo, who was driving the car, and Quintana, the passenger, were spooked by the undercover officer's presence and fled the scene. During the subsequent high-speed chase, a bag containing ten pounds of marijuana and a kilogram of cocaine was thrown from the car.

On June 18, 1993, Juan Robles, one of Sotelo's suppliers, sold five kilograms of cocaine to Joe Sotelo, received payment but delivered flour instead of cocaine. To make Robles return the money, Joe Sotelo, Edward Sotelo, Flores and another man, kidnapped Robles's fourteen-year-old brother, Gilberto Robles. Gilberto was threatened and hit, but sustained no injury except and small bump

4

on the head.  The police got involved, but were hindered because Gilberto was too scared of the Sotelos to cooperate with the police.  He was eventually returned home by the police.

Arthur Franklin, another Government witness, was arrested for a drug offense and had agreed to cooperate with the DEA before he became involved with the Sotelo organization.  He set up a 5-kilogram cocaine deal with Edward Sotelo.  When the cocaine was delivered, the police monitored the transaction and Edward Sotelo and Flores were arrested.

## II. SUFFICIENCY OF THE EVIDENCE

### a.  Standard of review

A conviction must be allowed to stand if, after viewing the evidence in the light most favorable to the prosecution, the reviewing court finds that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 570 (1979).

### b.  Edward Sotelo

Edward Sotelo challenges the sufficiency of the evidence to support his convictions on Count 2, Continuing Criminal Enterprise and Count 12, Distribution of Cocaine.

A conviction for Continuing Criminal Enterprise (CCE) requires proof that a defendant organized, supervised or managed five or more persons in a continuing series of drug violations from which the defendant obtained substantial income.  *See* 21 U.S.C. § 848. "Such relationships need not have existed at the same moment in

5

time.  It is sufficient if there exist separate, individual relations of control with at least five persons.  Furthermore, the requisite five persons need not act in concert at the same time.  Additionally, the same type of superior-subordinate relationship need not exist between the supervisor and each of the five other persons involved."  *United States v. Phillips*, 664 F.2d 971, 1013 (5th Cir. 1981) (citations omitted), *cert. denied*, 457 U.S. 1136, 102 S. Ct. 2965, 73 L. Ed. 2d 1354 (1982).  The Government need not prove that the defendant is the "single ringleader."  *Id*. at 1034.

Edward Sotelo argues that the evidence proved separate multiple conspiracies rather than a single conspiracy.  He contends that he was acting independently from other individuals, as evidenced by referrals to Sotelo from other drug sellers when they did not have enough cocaine to fill an order.  In determining whether single or multiple conspiracies exist, this Court looks at three factors: (1) the existence of a common goal; (2) the nature of the scheme; and (3) overlap of the participants.  *United States v. Maceo*, 947 F.2d 1191, 1196 (5th Cir. 1991), *cert. denied*, 504 U.S. 949, 112 S. Ct. 1510, 117 L. Ed. 2d 647 (1992).  First, the common goal was the sale of cocaine and marijuana; second, the nature of the scheme, to sell large quantities of drugs to others who were responsible for retailing it, is consistent throughout the evidence; and third, all of the indicted codefendants and cooperating Government witnesses were interrelated except witness Arthur Franklin, who came in at the end as an undercover informant.  The evidence in the record is sufficient to establish Edward

6

Sotelo's criminal liability for a CCE under the criteria set out in *Phillips*. Edward Sotelo's attack on his Continuing Criminal Enterprise conviction is without merit.

In order to prove that a defendant distributed a controlled substance, the Government must prove that the defendant (1)knowingly (2) distributed (3) the controlled substance. *See* 21 U.S.C. § 841(a)(1). Count 12 charged Edward Sotelo and Flores with distribution of cocaine in connection with the drug buy set up by Franklin, after which Edward Sotelo and Flores were arrested. Sotelo contends that his conviction in Count 12 rests solely on the perjured testimony of Arthur Franklin. There is no basis in the record before this Court for labeling Franklin's testimony perjured. Although his credibility was damaged because he continued to sell drugs after he agreed to work for the Government, his testimony about the specifics of the drug buy underlying Count 12 are corroborated by a taped phone conversation and by the testimony of the police officer that was posted outside the apartment during the buy. Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could well have found all the elements of distribution of cocaine beyond a reasonable doubt.

**c. Gary Artiaga**

Artiaga challenges the sufficiency of the evidence to support his conviction for conspiracy. Artiaga does not challenge the existence of a conspiracy, but claims that he did not know about it or participate in it. The lease for the group's drug storehouse

7

was in Artiaga's name and videotaped surveillance showed that he visited the warehouse. The evidence in the record also includes testimony that Peter Edwards purchased one kilogram of cocaine for $20,000 from Artiaga and Edward Sotelo in 1993; that Artiaga accompanied Edward Sotelo while Sotelo delivered drugs; and that Artiaga advised a potential purchaser to call Edward Sotelo in order to purchase drugs. The transcripts of two telephone conversations between Artiaga and Edward Sotelo in which they discussed drug negotiations, supply and prices to charge clients were before the jury as well. Based on our review of the record, we have concluded that the evidence was sufficient to support Artiaga's conviction for conspiracy.

**d. Lawrence Flores**

Flores argues that the evidence was insufficient to sustain his convictions for Count 1 - conspiracy and Count 12 - distribution of cocaine. Flores's position on the conspiracy count is that all the testimony implicating him in the conspiracy lacked credibility. Testimony established that Flores accompanied Edward Sotelo on a number of drug transactions, sometimes handed the drugs to the customer and was present at the drug warehouse, all in addition to his participation in the drug buy that resulted in his arrest. Further, Flores contends that the evidence on Count 12 is insufficient because it simply shows his presence at the drug buy. However, the officer's testimony established that Flores left the apartment where Franklin's drug buy was supposed to take place, retrieved the drugs from a car and returned to the apartment,

8

indicating that Flores was not just innocently present at the scene of the crime.  The evidence is sufficient to sustain Flores's convictions on Counts 1 and 12.

**e. Ernesto Quintana**

Quintana contends that the Government failed to prove the "knowledge" element of Counts 1, 10 & 11 as to Quintana.  He characterizes the evidence as showing that he was merely present during some drug transactions.  He contends that he did not even know drug transactions were taking place.  He also claims that the evidence did not show that he agreed to commit any crime, as required for the conspiracy conviction.  The Government's evidence against Quintana included testimony that: Quintana accompanied Edward Sotelo on a vast number of cocaine and marijuana deliveries, Blevins purchased drugs from Edward Sotelo and Ernest Quintana on a number of occasions, Quintana was present when the purchase price was paid during these transactions, Quintana delivered marihuana to Blevins by himself in one transaction and to Peter Edward on another occasion, and Quintana was with Edward Sotelo during the Blevins sting transaction in which they fled the scene.  This evidence is adequate to support the jury's verdict.

### III. EXCLUSION OF MINORITY MEMBERS FROM THE VENIRE

Appellants contend that they were denied their right to a petit jury drawn from a fair cross section of the community.  The trial court's factual determination that there was no systematic exclusion of minority members from the venire is reviewed for clear error.  *United States v. McKinney*, 53 F.3d 664 (5th Cir.), *cert.*

9

*denied*, 116 S. Ct. 261, 133 L. Ed. 2d 184 (1995).

The trial court denied a motion by Edward Sotelo to quash the jury panel because there was only one Hispanic person among the fifty venire persons. To establish a prima facie violation of the fair cross section requirement, the defendant must show that: (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this under-representation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979). Edward Sotelo asked the trial court to assume factors 2 & 3 based on the fact that only one Hispanic person was a member of a 50 person panel. It was not clear error for the trial court to deny the motion to quash, as Edward Sotelo failed to carry his burden to establish a prima facie violation.

### IV. DISQUALIFICATION OF DEFENSE ATTORNEY

Edward Sotelo and Joe Sotelo contend that the district court erred when it refused to permit the same attorney to represent four of the nine indicted co-defendants. The district court's disqualification of a defense attorney for conflict of interest is reviewed for abuse of discretion. *United States v. Vasquez*, 995 F.2d 40, 42 (5th Cir. 1993).

Joe Sotelo, Edward Sotelo, Flores and Artiaga were initially represented by the same counsel, Denver McCarty. All four were willing to waive any conflict of interest in order to allow McCarty

10

to represent them. Attorney McCarty told the district court that he had discussed with each of his clients the possible effects of plea offers and that he considered plea agreements unlikely for these four defendants. The district court, after conducting a hearing pursuant to Fed. R. Crim. P. 44(c)[3], determined that there was good cause to believe that a conflict would arise, particularly in pretrial plea negotiations. He therefore ordered that each defendant must have separate counsel. McCarty ultimately represented only Artiaga. Edward Sotelo and Joe Sotelo appeal the decision, arguing that they were deprived of their Sixth Amendment right to choice of counsel.

The Sixth Amendment protects an accused person's right to select and be represented by his preferred attorney, although the essential aim of the amendment is to guarantee an effective advocate for each defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers. *Wheat v. United States,* 486 U.S. 153, 159, 108 S. Ct. 1692, 1697, 100 L. Ed. 2d 140 (1988).

A defendant's right to choice of counsel is limited "not only by a demonstration of actual conflict, but by a showing of a

---

[3]Rule 44(c) provides:
Whenever two or more defendants have been jointly charged . . . and are represented by the same retained or assigned counsel . . . the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

11

serious potential conflict" even where a defendant expresses a desire to waive the potential conflict. *Wheat v. United States*, 486 U.S. 153, 164, 108 S. Ct. 1692, 1700 (1988). Appellants acknowledge the wide discretion this rule gives the district court, but characterize the court's plea agreement concerns as "unsupported and dubious speculation as to a conflict."

We disagree. Under the Supreme Court's analysis in *Wheat*, "[t]he evaluation of the facts and circumstances of each case . . . must be left primarily to the informed judgment of the trial court." *Id*. 486 U.S. at 164, 108 S. Ct. at 1700. Here, the trial court explicitly applied the Sixth Amendment, and *Wheat's* analysis to the facts developed at the hearing on this issue, and concluded that the Sixth Amendment would be better served in this case by separate representation for each defendant, particularly during pretrial plea negotiations. This conclusion is well supported by the record. We find no abuse of discretion in the district court's decision to disqualify attorney McCarty from representing Joe Sotelo and Edward Sotelo on the basis of potential conflicts of interest.

### *BRADY* IMPEACHMENT EVIDENCE

All of the Appellants contend that the Government's failure to timely disclose evidence which could have been used to impeach witness Arthur Franklin was a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) and that the trial court erred in denying a motion for new trial based on this failure. The United States Constitution forbids the Government

12

from withholding evidence favorable to the accused or useful for impeachment of a witness who testified against the accused. *Id.* Suppression of evidence favorable to the accused requires reversal if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different. *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985). A "reasonable probability" for the purposes of this analysis is a probability sufficient to undermine the confidence in the outcome. *Id*.

Four days after the jury returned its verdict, the Government informed appellants that witness Arthur Franklin was still involved in drug trafficking when he testified at trial. A Government agent who testified at the trial received information about these allegations on May 16, 1995, after Franklin had testified, but before the close of evidence. He revealed the information immediately to an Assistant United States Attorney not involved in this case, but no one told the prosecutor in this case about the information until after the verdict. The Government disclosed the information to appellants on May 22, 1995.

Although all of the appellants contend that they are entitled to a reversal on this ground, only Edward Sotelo and Flores were implicated in the drug transaction about which Franklin testified. The other appellants' *Brady* claims are frivolous.

Assuming that Franklin's continued involvement in drug trafficking would have undermined his credibility, it is unlikely that such impeachment evidence would have changed the verdicts as

13

to Edward Sotelo or Flores. The drug transaction which Franklin testified about was monitored by DEA agents, whose testimony corroborated Franklin's testimony, and a tape of a telephone conversation setting up the deal was admitted into evidence. We cannot say, based on this record, that there was a reasonable probability that, had the Government timely disclosed the evidence of Franklin's continued involvement in drug trafficking, the outcome of the trial would have been different.

## WRITTEN JURY CHARGE

Edward Sotelo and Artiaga contend that the district court erred in denying a request that a written copy of the charge be given to the jury during their deliberations. Determining whether the jury should be given a written copy of the court's charge is within a trial judge's discretion. *United States v. Acosta*, 763 F.2d 671, 677 (5th Cir.), *cert. denied,* 474 U.S. 863, 106 S. Ct. 179, 88 L. Ed. 2d 148 (1985).

A written charge was prepared and read to the jury. The district court denied Artiaga's request that a written copy of the charge be given to the jury. Edward Sotelo and Artiaga claim this was error since the charges were very complex and the jury needed the written instructions to help them in their deliberations. Appellants point out that the jury asked that a portion of the instructions be read back to them during deliberations. The district court read the portion requested twice. The Appellants complain that by reading the requested portion of the charge, but not re-reading other portions containing definitions of words used

14

in the re-read portion, the charge became unbalanced and the jury may have been confused.

This Court has disapproved of the practice of giving a copy of the jury instructions to the jury. *United States v. Perez*, 648 F.2d 219, 222 (5th Cir. Unit B), *cert. denied,* 454 U.S. 1055, 102 S. Ct. 602, 70 L. Ed. 2d 592 (1981). In addition, the Government contends that the jury's request that the court re-read one portion of the charge indicates that they would have made other such requests if they were uncertain about any other portions of the charge. Based on the record before us, the denial of the motion to give the jury a copy of the written charge was not an abuse of discretion.

## PROSECUTOR'S CLOSING ARGUMENT

Flores argues that the district court erred when it overruled his objection to the prosecutor's closing argument concerning Franklin's testimony in which he referred to Flores as "the chubby man." To warrant reversal of a conviction on grounds of improper jury argument, a reviewing court must determine whether a prosecutor's comments were both "inappropriate and harmful." *See United States v. Campbell*, 49 F.3d 1079, 1084 (5th Cir.), *cert. denied,* 116 S. Ct. 201, 133 L. Ed. 2d 135 (1995). Because Flores's objection to the remark at trial was based on a different theory than that presented on appeal, this Court applies the plain error standard of review.

During the Government's closing jury arguments, the Prosecutor said,

15

". . . and then just forget about the fact, even though Arthur Franklin didn't lie to you, and he could have lied to you and pointed at Larry Flores and said, "yeah, that was the fat man or the chubby man - -"

Flores' counsel objected to this comment as not being in evidence. The district court first sustained the objection, then changed the ruling and overruled the objection because "it's a logical inference from the evidence." Flores contends on appeal that the comment improperly vouched for the credibility of the Government's witness.

A criminal defendant bears a substantial burden when attempting to demonstrate that improper prosecutorial comments constitute reversible error. *United States v. Diaz-Carreon*, 915 F.2d 951, 956 (5th Cir. 1990). He must show that the comments substantially affected his right to a fair trial. *Id.* Three factors are probative to this showing: "the magnitude of the prejudicial effect of the remarks, the efficacy of any cautionary instruction, and the strength of the evidence of the defendant's guilt." *Id*. The magnitude of prejudicial remark here was minimal. The judge's ruling that the remark was a logical inference from the evidence was correct as a response to Flores' objection that it "not in evidence." However, for the first time on appeal, Flores contends that the remark was objectionable because it bolstered the witness's credibility. The remark did have a bolstering effect, but only marginally so. There was no cautionary instruction. However, the strength of Flores' guilt was strong. Based on the application of the three-factor test, Flores has not shown that the district court reversibly erred in overruling his objection to the

16

prosecutor's comment because he has failed to demonstrate anything close to plain error.

## TIME LIMITATIONS ON FINAL ARGUMENT

Edward Sotelo, Artiaga, and Quintana contend that the district court erred in refusing to allow them additional time for final argument. The length of time allocated to counsel for closing argument rests with the discretion of the trial court. *United States v. Moye*, 951 F.2d 59 (5th Cir. 1992).

Each defendant in a multiple-count, multiple-defendant case must be given adequate time in closing argument to mete out the evidence and issues particular to that defendant and to individualize his defense. *United States v. Okoronkwo*, 46 F.3d 426, 437 (5th Cir.), *cert. denied*, 116 S. Ct. 107, 133 L. Ed. 2d 60 (1995).

The district court initially advised the attorneys that the Government would be permitted 30 minutes and the appellants collectively 45 minutes. One of the appellants objected that 45 minutes was insufficient, and asked for 15 minutes per defendant. The district court then ruled that the Government would be permitted 30 minutes and each appellant would have 10 minutes, for a total of one hour.

Appellants argue that 10 minutes per appellant unreasonably curtailed their argument. Appellants contend that the case was legally and factually complex, covered six years of activity and multiple conspiracies, involved 40 witnesses and 133 exhibits, a twelve-count indictment, and a 22-page jury charge. The Government

17

responds that appellants make only conclusory assertions to support their claim, and made no offer of proof as to what arguments they were foreclosed from presenting at trial. Having reviewed the record, we find no abuse of discretion; the appellants' closing arguments adequately summarized the evidence and arguments and nothing in the record indicates what additional items would have been covered during closing had the trial allowed additional time.

### JURY MISCONDUCT

Edward Sotelo, Joe Sotelo, Quintana and Artiaga contend that the district court abused its discretion by denying their motions for mistrial based upon jury misconduct and by failing to properly investigate the allegation. Artiaga also contend that the district court abused its discretion by denying his motion for new trial, filed subsequent to trial, which was based upon the same allegation. He also claims that the court erred in denying his motion to contact and interview the jurors post-trial.

The district court's decisions in handling complaints of outside influence on the jury are reviewed for abuse of discretion. *United States v. Ramos,* 71 F.3d 1150, 1153-54 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 1864, 134 L. Ed. 2d 962 (1996). The district court must balance the probable harm resulting from the emphasis that a particular mode of inquiry would place upon the misconduct and the disruption occasioned by such an inquiry against the likely extent and gravity of the prejudice generated by the misconduct. *Id.* Because we as an appellate tribunal are in a poor position to evaluate these competing consideration while the trial

18

court can better judge the mood and predilections of the jury, we accord broad discretion to the trial court in these matters. *Id.* Likewise, the district court's decision to deny a post-trial interview pursuant to Local Rule 8.2(e) is reviewed for abuse of discretion. *Salinas v. Rodriguez,* 963 F.2d 791, 794 (5th Cir. 1992), citing *United States v. Sedigh*, 658 F.2d 1010, 1014 (5th Cir. Unit A 1981), *cert. denied*, 455 U.S. 921, 102 S. Ct. 1279, 71 L. Ed. 2d 462 (1982).

During jury deliberations, juror Gloria Ayala stepped out of the jury room and informed the court security officer that some of the other jurors were making racial remarks that upset her. Ayala remained in the alternate jury room while the district court conferred with the parties. The district court proposed to bring the entire jury into the courtroom and question Ayala about her allegations. The defendants objected that the proposed procedure was intimidating and coercive. The objection was denied. The jury was brought into the courtroom and the district court explained that he had received a complaint from Ayala, and that he had brought them back into the jury room so that Ayala could explain what was bothering her. The district court instructed Ayala not to disclose any information about the deliberation process. The following dialogue ensued:

> THE COURT: Can you tell us what has happened that has caused you a concern, bearing in mind what I just told you about what you should not disclose without alerting me ahead of time that you would have to. And I think everyone is grown up, so be perfectly candid about what you heard and the problems that's causing it.

19

JUROR AYALA: Without hurting anybody's feelings, no, I can't Judge. I can't.

THE COURT: Well, like I say. I think everyone is grown up. If it's simply a matter of hurting feelings, let's go ahead and lay it on the line. If it's a matter of disclosing the things I told you not to disclose, then we need to discuss the matter further. But if it's simply a matter of hurting feelings, let's lay it on the line.

JUROR AYALA: Well, I just feel like -- I don't know. I just feel a lot of racial tension.

THE COURT: I'm sorry?

JUROR AYALA: Racial tension.

THE COURT: Well, is it because of specific things that have been said?

JUROR AYALA: In a roundabout way, yes.

THE COURT: Can you give me an example of something that's been said that causes you to feel that way?

JUROR AYALA: Not in general, no. I mean, I thought I was a strong person, but after four days of this, I'm not.

THE COURT: You mean four days of trial?

JUROR AYALA: Well, yeah. Not so much the trial but activities: listening, everything like that.

THE COURT: Are you saying that since the trial started, you had a sense of -- Well, say to me what you have had a sense of since the trial started so I won't put words in your mouth.

JUROR AYALA: You know, these are Mexican boys. I'm a Mexican, okay. These people are looking at them as Mexicans.

THE COURT: Looking at what?

JUROR AYALA: Looking at these boys as Mexican boys. They're not looking at them as just boys.

THE COURT: Is that something you're saying that happened through the trial or just in the discussions?

20

JUROR AYALA:    Just in different things that I've seen.

THE COURT:    You mean during the course of the trial?

JUROR AYALA:    I don't know how to explain it to you or whether you understand me what I'm trying to say.  It's just a --

THE COURT:    I'm trying to.

JUROR AYALA:    You know I just --

THE COURT:    What I'm trying to find out now is your problem, in part, because of what witnesses said or what happened here during the trial?  Is that part of your problem?

JUROR AYALA:    No.

THE COURT:    Okay.  It's simply what other members of the jury, their reaction --

JUROR AYALA:    Correct.

THE COURT:    -- to things that have happened.  Has anyone made any specific comment to you or to each other where you heard it that would cause you to think that any of them are making a racial remark or racial innuendo or a national origin remark or a national origin innuendo.  And it may be difficult for you to say it, but we've got to find out what the problem is.

JUROR AYALA:    What I would perceive as being offensive to me, you may not perceive it as being offensive, okay?  That's why what I might tell you might sound silly.

THE COURT:    Well, it might not.  So tell me.

JUROR AYALA:    To me it's, you know, pretty serious, I think.

THE COURT:    Is there anyway you can express it in words what you're talking about that you've heard or you've seen by way of reaction of the other jurors?

JUROR AYALA:    Okay, for instance, today, we all didn't agree on one subject, and because I was one that didn't agree on it -- and I wasn't the only one.  When the question was asked, "Well, what is it that you don't understand about this

21

subject," it was directed at me. They turned to me. They didn't turn to the whole people that had questioned it, okay?

THE COURT: Okay.

JUROR AYALA: Like I was singled out. "Why don't you believe this?"

THE COURT: And I do understand what you're telling me. Can you give me any other example of what you're talking about?

JUROR AYALA: No.

THE COURT: Is that particular thing you're talking about what prompted you to leave the jury room?

JUROR AYALA: Yes, sir.

THE COURT: I'm sorry?

JUROR AYALA: That's why I'm telling you about the instance.

THE COURT: That's what prompted you to leave the jury room?

JUROR AYALA: Right.

THE COURT: Can you give me an example of any other instance?

JUROR AYALA: No.

THE COURT: Okay, you can be seated, and I appreciate your candor.

The district court concluded that nothing had occurred which would reflect any racial bias or prejudice on the part of any other juror. When Artiaga's counsel pointed out that "there were a couple two or three jurors that were nodding their heads in agreement with her," the district court stated:

Well, we can't get involved with what the head nods are supposed to mean. When I say there is a problem, we have to resolve it. There were several of them nodding their heads, and I did take some understanding of, "now we know

22

why she's upset, as if they didn't know before."

The district court then instructed the jury to continue deliberating and to base their decision on the evidence, and not to take into account the race or national origin of any party or any witness in the case. The district court also instructed the jurors that Ayala had done the right thing and asked them to inform the court if any disparaging comments became a problem.

Appellants filed a motion for mistrial at that time and a motion for new trial after the verdict was returned, arguing that Ayala's statements presented a *prima facie* showing of jury misconduct. After the trial they also filed a motion pursuant to Local Rule 8.2(e)[4] to interview Ayala. All the motions were denied.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ." U.S. CONST. amend. VI. All of the appellants contend that they were denied their Sixth Amendment right to an impartial jury. The Government does not dispute that open racial bias is unacceptable during jury deliberations. Rather, it is the Government's position that, given the broad discretion afforded trial courts in addressing alleged jury misconduct, the district court's response in this case was sufficient.

There is no Fifth Circuit precedent that prescribes a

---

[4]Northern District of Texas, Local Rule 8.2(e) provides: "Neither a party nor attorney in a case (or a representative of either) shall, before or after trial, contact any juror, except upon explicit leave of the Presiding Judge."

23

procedure for investigating and resolving allegations of jury racial bias made during the trial. Case law speaks in terms of extrinsic influences such as trial publicity, *United States v. Herring*, 568 F.2d 1099 (5th Cir. 1978) versus intrinsic influences such as a juror announcing that he had determined the defendant was guilty prior to the end of the trial. *United States v. Webster*, 750 F.2d 307 (5th Cir. 1984), *cert. denied*, 471 U.S. 1106, 105 S. Ct. 2340, 85 L. Ed. 2d 855 (1985). This circuit has afforded trial courts broader discretion in dealing with intrinsic influences due to jury misconduct than it has afforded in cases of extrinsic influences and has specifically declined to presume prejudice from intrinsic influences because it would hamper the judge's discretion. *Id.* at 338.

Appellants attempt to characterize the problem of racial bias as extrinsic, in order to require the district court to perform the burden shifting analysis articulated most recently in *United States v. Ruggiero*, 56 F.3d 647 (5th Cir.), *cert. denied*, 116 S. Ct. 486, 133 L. Ed. 2d 413 (1995). In that case a juror obtained information during the trial about the defendant and one of the Government witnesses that was not admitted into evidence. The extrinsic influence analysis begins with an initial presumption of jury impartiality. *Id.* at 652. When a colorable showing of extrinsic influence appears, the trial court must investigate the asserted impropriety. *Id.* Such a showing creates a rebuttable presumption of prejudice to the defendant and the Government has the burden of proving the harmlessness of the influence. *Id.*

24

We reject appellant's characterization of the incident in this case as an extrinsic influence. We believe that it can more accurately be described as an intrinsic influence. However, regardless of the extrinsic/intrinsic classification, the trial court has broad discretion and the ultimate inquiry is: "Did the intrusion affect the jury's deliberations and thereby its verdict?" *United States v. Ramos*, 71 F.3d 1150, 1154 (5th Cir. 1995).

Appellants rely on *United States v. Heller*, 785 F.2d 1524 (11th Cir. 1986) where the Eleventh Circuit held that the trial court erred in failing to grant a mistrial based on anti-Semitic comments about the defendant made by jurors to other jurors. The opinion noted that juror prejudice prevents the impartial decision-making that the Sixth Amendment and fundamental fair play require. *Id*. at 1527. In *Heller*, the trial judge questioned each juror individually, apart from counsel for either party, in an attempt to "get rid of the taint that we have seen here." *Id*. at 1526. As a result of the individual voir dire, it came to light that jurors had made overt anti-Semitic slurs, had prejudged the defendant's guilt and "had all the appearance of a linch [sic] mob." *Id*. The Eleventh Circuit held that the trial court clearly abused his discretion when he refused to declare a mistrial upon learning of the misconduct of the jury. Although not controlling precedent, we agree that *Heller* contains a helpful discussion of the appropriate response to racial prejudice exhibited by a juror. However, the alleged racial tension in this case is distinguishable from *Heller* in both kind and degree. Juror Ayala's testimony identified two

25

circumstances from which she inferred racial prejudice on the part of other jurors against Hispanics, but no overtly racial remarks or behavior.

Given his broad discretion to fashion an investigation, the trial court's choice of techniques was not so coercive that it interfered with truth-seeking. This record does not contain evidence from which we could conclude that the Appellants were denied their Sixth Amendment rights to an impartial jury. Ayala's obvious reluctance to speak in front of her fellow jury members, and the unexplained head nodding from other jurors are troublesome. However, the trial court's choice of investigative techniques that are less than ideal does not support a holding that the trial court abused its discretion by failing to adequately investigate the allegation of racial prejudice among the jury.

Focus in the briefs on Rule 606(b) is misplaced. Rule 606(b) concerns the competence of juror testimony during "an inquiry into the validity of a verdict." Since the problem was brought to the court's attention prior to verdict, 606(b) does not impact the availability of juror testimony in resolving the factual issues raised. The trial court relied on *Tanner v. United States*, 483 U.S. 107, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987), a Rule 606(b) case, in denying the Appellants post-trial motion to interview jurors. While *Tanner* speaks to post-trial jury inquiries, neither *Tanner* nor Rule 606(b) helps resolve the real issue in this case which was brought to the trial court's attention pre-verdict.

Because we hold that the trial court did not abuse his

26

discretion in dealing with the jury prejudice issue during trial, the post trial denial of jury interviews is moot.

## ERRONEOUS ADMISSION OF EVIDENCE

Flores contends that the district court abused its discretion in denying his motion for mistrial after hearsay testimony came into evidence implicating him in the Arthur Franklin drug buy. FED. R. EVID. 103(a) precludes grounding a reversal on the erroneous admission of evidence unless "a substantial right of a party is affected." If the defendant's substantial rights were not affected, the error is harmless, and this Court will not reverse. *See* Fed. R. Crim. P. 52(a). When the evidence has been stricken and the trial court has instructed the jury to disregard it, there is less probability that the error substantially influenced the jury's decision. *United States v. Drew,* 894 F.2d 965, 973 (8th Cir.) *cert. denied,* 494 U.S. 1089, 110 S. Ct. 1830, 108 L. Ed. 2d 959 (1990).

A police officer who was part of the surveillance outside of the apartment during the Franklin drug buy testified that two Hispanic males arrived at the apartment. He testified that he knew one of the men to be Edward Sotelo and the other one was "later identified as Lawrence Flores." The district court sustained Flores' objection on the basis of hearsay and instructed the jury to disregard the officer's testimony concerning the identity of the second Hispanic male.

On appeal, Flores does not address how this hearsay testimony affected his substantial rights. Flores' identity and role in the

27

Franklin drug buy was established through the testimony of two other witnesses, whose testimony was not hearsay and to which Flores did not object. Since the hearsay testimony of the police officer was cumulative of other evidence admitted without objection, its admission was harmless. *Unites States v. Cavin*, 39 F.3d 1299, 1311 (5th Cir. 1994).

Joe Sotelo likewise contends that the district court abused it discretion by denying his motion for mistrial after a Government witness gave a non-responsive answer indicating that Joe Sotelo had been arrested for murder.

A Government witness, on direct examination, commented that Edward Sotelo had told him "that the police had come and kicked in his door and taken -- took his brother to jail for murder...." Joe Sotelo's objection based on hearsay was sustained, and the district court gave a limiting instruction that the jury was not to consider it as evidence against any of the other defendants. Joe Sotelo requested a mistrial during the next recess after the witness's statement. The basis for the motion for mistrial was that the statement was "so prejudicial I don't think there is anyway the jury could disregard that and . . .at bench conference earlier in this trial [the court] had instructed the Government not to raise any 404(b) material with regard to [Joe Sotelo] without coming up to the bench first and getting a ruling on it." The witness's stray comment was the only time the jury heard about Joe Sotelo's murder charge. The district court overruled the motion for mistrial but invited Joe Sotelo, as well as any other appellant, to

28

write out any further instructions they wanted given to the jury for his consideration.

The Government contends that because Sotelo has not established that the comment was prejudicial and because the evidence of Joe Sotelo's guilt is so overwhelming, any error was harmless. We agree that the error is harmless in light of the remaining admissible evidence of Joe Sotelo's guilt. *See United States v. Limones*, 8 F.3d 1004, 1008 (5th Cir. 1993), *cert. denied,* 114 S. Ct. 1562, 128 L. Ed. 2d 209 (1994).

**LIMITATION ON CROSS EXAMINATION OF GOVERNMENT WITNESS**

Joe Sotelo contends that the district court abused its discretion by limiting his cross-examination of Juan Robles regarding five felony charges pending against him at the time of trial. The trial court has the discretion to impose reasonable limits on the extent of cross-examination. *United States v. Cooks,* 52 F.3d 101, 103 (5th Cir. 1995). However, the trial court's discretion is limited by the requirements of the Confrontation Clause of the Sixth Amendment. *Id.*

Joe Sotelo argues that the trial court's limitation on the cross-examination of Juan Robles concerning five state felony charges -- two for attempted murder -- pending against him at the time of trial requires reversal.

Rule 608(b) provides for impeachment on cross-examination with acts other than convictions if probative of the witness's credibility, particularly if the evidence tends to show bias or motive for the witness to testify untruthfully. *United States v.*

29

*Thorn*, 917 F.2d 170, 176 (5th Cir. 1990).  In *Thorn*, this Court held that the trial court had not abused its discretion in refusing impeachment with state indictments because the defendant "had failed to offer any evidence that the Government could influence the disposition of the state court proceedings.  The existence of a pending state court indictment on charges totally unrelated to the testimony offered . . . was not shown to give [the witness] a substantial reason to cooperate with the federal prosecution." *Thorn*, 917 F.2d at 176.

The only evidence concerning this question was in response to Joe Sotelo's question to Robles asking if his cooperation with the Government and his testimony were motivated by a desire to gain leniency for the charges currently pending against him.  Robles relied, "No."  No other evidence tended to show that Robles thought that the Government could influence the disposition of the state court charges or that the Government could in fact exert such influence.  The district court did not abuse its discretion in limiting the cross-examination of Robles.

### CUMULATIVE EFFECT OF ERRORS

Having found no error on the part of the trial court, we find no merit in Artiaga's contention that the cumulative effect of trial errors denied him his Fifth Amendment right to due process of law.

### SENTENCING ISSUES

This Court shall accept the trial court's findings of fact during sentencing unless they are clearly erroneous and shall give

30

due deference to the district court's application of the Sentencing Guidelines to the facts. *See* 18 U.S.C. § 3742(e); *United States v. Otero*, 868 F.2d 1412, 1414 (5th Cir. 1989). In making findings pursuant to the Sentencing Guidelines, a district court need only be convinced by a preponderance of the evidence. *United States v. McKinney*, 53 F.3d 664, 677 (5th Cir.), *cert. denied,* 116 S. Ct. 261 (1995). Credibility determinations in sentencing hearings "are peculiarly within the province of the trier-of-fact." *United States v. Sarasti*, 869 F.2d 805, 807 (5th Cir. 1989).

**a. Quintana**

<u>Calculation of drug quantity</u>: The Sentencing Guidelines allow the sentencing court to hold a defendant accountable for all relevant conduct. *United States v. Smallwood*, 920 F.2d 1231, 1237 (5th Cir. 1991). A co-conspirator is accountable for his own conduct and for the foreseeable acts of his co-conspirators committed in furtherance of the conspiracy. U.S.S.G. § 1B1.3(a)(1)(B). The pre-sentence report, adopted by the district court, found Quintana accountable for 9,638 kilograms of marijuana equivalency. Quintana contends that the only drug quantities reasonably foreseeable to him are the 1 kilogram of cocaine and ten pounds of marijuana discarded from Edward Sotelo's vehicle after the failed undercover Blevins buy. The remaining disputed amounts are the drug quantities sold to witnesses Bryant and Blevins by Sotelo. Quintana contends that the evidence does not support a finding that he knew about these transactions. The Government responds that Blevins and Bryant testified that Quintana accompanied Sotelo to

the purchases, sometimes made drug deliveries by himself and saw drug payments being made.  Based on this testimony, the district court did not clearly err in finding that those amounts were foreseeable to Quintana and assigning him a Base Level Offense 34 (3000-10,000 kilograms of marijuana equivalent).

Minimal participation reduction: A defendant may receive a 2-level reduction in total offense level if his role in the offense was minor, and a 4-level reduction if his role was minimal.  *See* U.S.S.G. § 3B1.2.  Quintana was awarded the 2-level reduction but contends that the district court erred in not granting him a 4-level reduction for minimal participation.  The Application Notes to § 3B1.2 provides that the nominal participant status

> is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group.  Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant. . . . It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to off-load part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.

*See* U.S.S.G. § 3B1.2, comment. (n.1 & 2).  Evidence of Quintana's long-term involvement and participation in more than twenty deliveries supports the district court's rejection of minimal participation.


**b. Artiaga**

Calculation of drug quantity: Artiaga's Pre-sentence Report stated that based on the testimony of Bryant, Henton, Edwards, Hall and

Reed, Artiaga was accountable for 186 kilograms of cocaine.  Like Quintana, Artiaga contends that he was not directly involved in the sale of 186 kilograms of cocaine nor was it foreseeable.  At sentencing, Artiaga agreed that he had distributed 130 - 140 kilograms of cocaine.  It was not clear error to attribute the other 46-56 kilograms to Artiaga based on the evidence of a lengthy and close drug-related relationship with Edward Sotelo.

### c. Flores

Flores contends that the district court erred in raising his offense level 2 levels for the drug-related kidnapping of Gilberto Robles, because the kidnapping was not reasonably foreseeable to or jointly undertaken by Flores.  Flores does not deny that he was present during the kidnapping, but claims that Gilberto testified that Flores was not armed, that Flores attempted to help him, that he was as much a prisoner as Gilberto and was threatened by the Sotelos for trying to help Gilberto.

The Government replies that because Flores was actually involved in the kidnapping, foreseeability was not an issue.  The only issue is whether the court's factual finding is plausible in light of the record as a whole.  Given Flores' undisputed involvement in the underlying drug deal and in the kidnapping, the district court's finding is plausible.  Further, the district court sentenced Flores at the bottom of the guideline range, specifically noting that he was taking into account Flores' undefined assistance to Gilberto during the kidnapping in determining the sentence.

### CONCLUSION

Based on the foregoing, we AFFIRM the convictions and sentences of all Appellants.

AFFIRMED.