# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 27, 2013

No. 12-50500

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff – Appellee

v.

MIGUEL NIETO; RAMON MORALES; CARLOS HERNANDEZ; SANTOS ALMANZA

Defendants – Appellants

Appeals from the United States District Court
for the Western District of Texas

Before GARZA, SOUTHWICK and HAYNES, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

This appeal arises out of the convictions and sentences of four defendants, Miguel Nieto, Ramon Morales, Carlos Hernandez, and Santos Almanza. The indictment charged three counts: (1) racketeering in violation of 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) conspiracy to racketeer in violation of 18 U.S.C. § 1962(d) of RICO; and (3) conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 846. Nieto, Hernandez, and Almanza were charged with and convicted on all three counts. Morales was charged with and convicted

No. 12-50500

on Count 3 only. All defendants appeal their convictions and Nieto appeals his sentence. We AFFIRM.

## I

The defendants ("Appellants") are members of the Barrio Aztecas ("Aztecas"), a gang that operates inside prison and outside prison, where it runs a drug distribution network in the Midland-Odessa area. As part of ensuring control over the drug trade in Midland-Odessa, the Aztecas require all members in prison to report to the local Aztecas leader once released, charge all non-Aztecas drug dealers a tax (or "cuota"), rob and assault non-Aztecas dealers who do not pay the cuota, and assault Aztecas who do not follow orders. A portion of robbery proceeds is paid to ranking Aztecas for the purpose of supporting members in prison. The Aztecas periodically meet at the local leader's house to discuss the drug dealing business, cuota payments by rival drug dealers, and punishing Aztecas who are not following orders.

## A

The indictment set out ten racketeering acts in support of Counts 1 and 2. Racketeering Acts Three, Four, Nine, and Ten are directly relevant to this appeal. The remaining Racketeering Acts charged Almanza with attempted murder and conspiracy to murder, two acts of robbery, and aggravated robbery.

Racketeering Act Three charged Nieto with an aggravated robbery that occurred on or about November 5, 2009. Marcos Calderon, another member of the Aztecas, and Nieto tried to rob a drug dealer, Roman Avila, who was not an Aztecas member. Another member of the Aztecas, Steven Corona, tried to direct the two to Avila's house. Roberto Urias answered the door at the first house Corona directed them to, and the two demanded to know whether Roman was there, threatened Urias with a gun, and ordered him to the ground. When Urias told them he did not know Roman, they pushed him to the ground, kicked him, and threatened to kill him. They took his wallet and left in a white truck, and

Urias identified Nieto out of a photo line-up as the robber without the gun while Calderon testified Nieto was the one with the gun.

Calderon and Nieto then went to another house across the street thinking it was the correct house. A young girl, Maria Carrera, answered the door, the two forced their way into her house, and one pointed a gun at her. They asked for Roman and realized they had the wrong house when she told them she did not know anyone named Roman. Calderon and Nieto left in a white truck without stealing anything.

Calderon and Nieto then met with Almanza and his girlfriend, Vanessa Flores. Calderon and Nieto laughed in front of Almanza and Flores about mistakenly going to the two houses. Nearly two years later, Sergeant Mitch Russell of the Midland Police Department, the case officer, interviewed Nieto. Nieto waived his *Miranda* rights and admitted to mistakenly going to the two houses and robbing the first.

Racketeering Act Four charged Nieto with an aggravated robbery that occurred on or about November 7, 2009. This robbery occurred on the same night and after the robbery in Racketeering Act Three. After meeting with Almanza and Flores, Flores drove Calderon and Nieto to Avila's house. Calderon and Nieto broke in when Avila's girlfriend, Sabrina Rodriguez, refused to allow them in. The two pushed and kicked Rodriguez, threatened her with a gun, and stole her money and some cocaine from the house. They then left and went to Almanza's sister's house to split the proceeds amongst themselves.

Racketeering Act Nine charged Almanza and Hernandez with aggravated robbery. Calderon and Almanza robbed Victor Castrejon, a drug dealer not affiliated with the Aztecas, twice. The first time they forced Castrejon to let them into his house by using a gun. They stole Castrejon's marijuana, money, and cocaine. The second time Hernandez was with Calderon and Almanza. Flores drove the three to Castrejon's house. The three forced their way into

No. 12-50500

Castrejon's house, stole a shotgun and a handgun, hit Castrejon with one of the guns, cut his head with a knife, and stabbed him in the chest for being a member of another gang. They used the knife to cut off the hair of Castrejon's female companion and left cut marks on her neck. They stole some cocaine, beer, a cell phone, and jewelry. Flores saw them come out of Castrejon's house with two guns.

## B

Racketeering Act Ten was based on the same set of facts underlying Count 3, conspiracy to possess with intent to distribute controlled substances, specifically cocaine and marijuana. This Act was based on two sets of relevant incidents and three relevant searches by law enforcement. We recount each in turn.

The first set of incidents involved Fred Duran, another Aztecas member. Morales and yet another Aztecas member, Johnny "Green Eyes" Barboza-Rodriguez, drove from Midland to Dallas to meet with Duran. The two bought two kilograms of cocaine from Duran and went back to Midland. The two returned a second time to buy cocaine, this time directly from Duran's source, and they sold some of that cocaine to Duran at cost. In addition, Morales and Barboza-Rodriguez had diluted, or "re-rocked," cocaine in order to increase its quantity.

The second set of incidents involved Aztecas members physically assaulting Barboza-Rodriguez on two occasions. The Aztecas were upset with Barboza-Rodriguez for not paying a tax to them on his drug-dealing, even though Aztecas members ordinarily do not pay taxes, and for dealing drugs with members of a rival gang. As a result, five Aztecas tried to get Barboza-Rodriguez into a vehicle, but Barboza-Rodriguez tried to run because he feared for his life. Four of the five, including Almanza and Hernandez, caught and assaulted him, while the fifth, Venito Gonzales, waited in the vehicle. As part

of the assault, Almanza split Barboza-Rodriguez's head open with a gun, but Barboza-Rodriguez did not go to a hospital for fear of being questioned. The second assault occurred while Barboza-Rodriguez was in jail. That time, both Nieto and Hernandez attacked Barboza-Rodriguez because they believed he was cooperating with law enforcement.

The first search by law enforcement was of Gonzales' hotel room. Law enforcement officials recovered digital scales, a pan used to convert powder cocaine into crack cocaine, crack cocaine, small plastic bags, and other drug paraphernalia. Gonzales' seized cell phone contained incoming text messages asking to buy drugs and an outgoing message threatening the recipient and stating Gonzales was a gang member. Sergeant Russell concluded Gonzales intended to distribute the crack. Gonzales admitted to law enforcement after hearing his *Miranda* rights that he had been converting powder into crack to use and to sell. Sergeant Russell estimated Gonzales sold about 224 grams of crack cocaine.

The second search was of Almanza's sister's house. Almanza and Hernandez, among others, were present at the house. Law enforcement officials recovered the shotgun stolen from Castrejon, which at this point had its barrel and stock sawed off.

The third search was of Morales' home. Law enforcement officials found scales, powder cocaine, crack cocaine, documents containing information about the Aztecas, and bread pans and glassware used to re-rock cocaine. Sergeant Russell concluded these evinced an intent to distribute drugs.

## C

Appellants were indicted, pled not guilty, and went to trial. After five days of trial the district judge received a note from Juror D.D. expressing concern for the safety of her family and asking whether precautions should be taken. The judge conferred with the parties, and all agreed the best course was to have the

judge speak to the jury in open court and reassure the members that there was nothing to be concerned about. Since all the parties agreed, the district court said the following to the jury:

> Now, to be exact, this is my 318th jury trial that I have tried in the last nine years. So I'm a lot more used to being here in the courtroom than y'all are, thank goodness. And for many of you, this may be the first trial you ever sat in. And jurors, when we have criminal cases, say, "Gosh, we're hearing all this stuff that's going on," not just in this case but all the cases that we have. "And, you know, do I need to be concerned about what's going on and everything like that?" The answer is no, you don't need to be concerned. We've never had anything ever happen in any of our cases to anybody or anything. So you don't need to be concerned about that.
>
> You need to decide this case based solely on the facts that you heard here in the courtroom and the law that—again, I think we've had a very, very respectful trial with all the parties involved, both the Government's—both the Government as well as the Defendants as well. I think everything has proceeded very well.

After dismissing the jury for the weekend the judge asked every party whether that instruction was sufficient. All agreed it was; none objected.

After the weekend the Government informed the court that over the weekend Juror D.D.'s husband contacted a friend who then contacted Sergeant Russell, the case officer, out of concern for the juror's safety. The judge met with Juror D.D. in chambers with only a court reporter present. The juror confirmed her husband reached out to the friend. She stated she had not made her mind up about the case and could decide the case based solely on the facts, the evidence, and the law. She indicated there was some discussion about safety in the jury room, but that any fears were allayed after the judge spoke to the jury prior to the weekend. She said her husband was aware the case involved the Aztecas and was concerned with her safety, giving the impression that the concern was on his part, not hers.

6

No. 12-50500

The judge conferred with the parties and told them what Juror D.D. had said.  The judge and the parties agreed that the best course of action would be for the judge to speak to each juror individually ex parte with a court reporter present, outside the presence of the defendants.  The parties and the judge agreed the judge would ask each juror whether he or she had discussed the case with anybody or with other jurors, had anxiety about the case, had made up his or her mind about the case, and can decide the case based on the facts and the law.  The judge proceeded to speak with each juror ex parte.  He reported to the parties that two indicated they had expressed some anxiety to their spouses at first but were no longer concerned, many had not talked to anyone and did not have any concerns, and all said they could decide the case based solely on the evidence and law after closing arguments.  The judge indicated he believed all the jurors could follow the judge's instructions, but that he would consider dismissing Juror D.D.  At that point all four defendants moved for a mistrial, and none of the parties objected to dismissing Juror D.D.  The judge dismissed Juror D.D. and replaced her with an alternate (the judge had spoken to the alternate ex parte just as he had the other jurors).

The jury convicted the four defendants on all the counts each was charged with.  The defendants timely appealed three issues: (1) Nieto and Hernandez appeal the sufficiency of the evidence supporting their convictions; (2) all defendants ("Appellants") appeal the denial of their motions for a mistrial; and (3) Nieto appeals his sentence.

## II

Nieto and Hernandez assert the Government did not produce sufficient evidence for conviction.  We review challenges to the sufficiency of the evidence de novo.  *United States v. Ollison*, 555 F.3d 152, 158 (5th Cir. 2009).  "In assessing a challenge to the sufficiency of the evidence, we must determine 'whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Pruett*, 681 F.3d 232, 238 (5th Cir. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "To be sufficient, the evidence need not exclude every reasonable hypothesis of innocence, so long as the totality of the evidence permits a conclusion of guilt beyond a reasonable doubt." *United States v. Hicks*, 389 F.3d 514, 533 (5th Cir. 2004).

Nieto and Hernandez challenge the sufficiency of the evidence for their convictions on each of the three counts. To prove Count 1, racketeering in violation of 18 U.S.C. § 1962(c), the Government "must prove (1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was employed by or associated with the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation was through a pattern of racketeering activity." *United States v. Posada-Rios*, 158 F.3d 832, 855 (5th Cir. 1998) (internal quotation marks omitted). "'Pattern of racketeering activity' is a defined term and requires at least two acts of 'racketeering activity,' the so-called predicate acts . . . ." *Salinas v. United States*, 522 U.S. 52, 62 (1997) (quoting 18 U.S.C. 1961(5)). In this case, then, the first count requires sufficient evidence to prove (1) the existence of the Aztecas, (2) each of them was associated with the Aztecas, (3) each participated in the conduct of the Aztecas, and (4) that participation was through a pattern of racketeering activity. *See Posada-Rios*, 158 F.3d at 855.

Many witnesses testified to the existence of the Aztecas as a gang that operates within and outside of prison with the twin objectives of protecting members in prison and ensuring the gang has a monopoly on the drug trade by stealing from and using violence against rival dealers and out-of-line members. These witnesses include Barboza-Rodriguez, Duran, Calderon, and Flores. These same witnesses identified Nieto and Hernandez as members of the

No. 12-50500

Aztecas. Accordingly, there was sufficient evidence to establish the first two requirements, the existence of the Aztecas and the associations of Nieto and Hernandez with the Aztecas.

The crux of Nieto's and Hernandez's challenges is whether there was evidence to support the next two requirements and, consequently, the first count. Nieto and Hernandez assert the Government did not meet its burden of producing any evidence to meet the third requirement; that is, the Government did not show that the predicate acts had to do with the Aztecas as opposed to being committed by Nieto and Hernandez for personal gain apart from the gang. Nieto and Hernandez assert Racketeering Acts Three and Four (Nieto) and Nine (Hernandez) at most establish that they robbed people for personal gain. They contend Calderon's testimony that (1) the proceeds of robberies that were not carried out as a result of a direct order from the gang were split between the participants in the robberies without sending a portion to the gang and (2) the participants here did not send portions of the proceeds to the gang supports this assertion.

Even though the jury was free to conclude those robberies were of a purely personal nature and were not committed in furtherance of the Aztecas' business, it did not have to and, in fact, did not. The jury was presented with many witnesses who testified to the nature of the Aztecas as a gang that utilizes these types of robberies—robberies of rival drug dealers—to ensure it remains in control of the drug trade. As members of the Aztecas, Nieto and Hernandez selected victims based on this factor, and the jury could therefore conclude the robberies were committed in furtherance of the objectives of the Aztecas, even if Nieto and Hernandez also had personal motivations. Nieto and Hernandez make the same argument about Racketeering Act Ten and the conspiracy charged in Count 3, but the same reasoning applies. As discussed below, there was sufficient evidence to convict Nieto and Hernandez on Count 3, which

charged them with the conspiracy to distribute count apart from racketeering, and the jury was free to link this offense to the Aztecas given witness testimony establishing that an objective of the Aztecas was to deal drugs. *See United States v. Delgado*, 401 F.3d 290, 298 (5th Cir. 2005) ("[Defendant] . . . raises the argument that the criminal activities proved at trial were . . . personal business . . . . [W]e reject that argument.").

The fourth prong of Count 1, participation through a pattern of racketeering activity, requires the Government to show Nieto and Hernandez committed at least two predicate acts in furtherance of the Aztecas' business that establish a threat of continued criminal activity. *See id*. Nieto and Hernandez assert there was insufficient evidence to establish they actually committed the acts. Nieto was charged with robbing Urias and Carrera in an attempt to rob Avila in Racketeering Act Three and with robbing Avila on the same night in Racketeering Act Four. Witnesses testified that Nieto committed both acts. Calderon, who committed the robberies with Nieto, testified that the two of them were misdirected to the first two houses, robbing Urias at the first, before robbing Avila later that night. Urias and Carrera, who were at the first two houses, corroborated Calderon's testimony, and Urias even identified Nieto as one of the perpetrators. Sergeant Russell testified that Nieto admitted to Racketeering Act Three, though he denied robbing Avila. Avila's girlfriend Rodriguez, who was home at the time of the robbery, identified Almanza, not Nieto, as the perpetrator. The jury was free to credit the testimony it found most credible, and a rational jury could credit Calderon's testimony, disbelieve Rodriguez's testimony, find what Nieto told Sergeant Russell about the Avila robbery unconvincing, and conclude Nieto did in fact commit these robberies. Furthermore, even if there was insufficient evidence to support Nieto's involvement in Racketeering Act Four, the outcome remains the same because

Racketeering Acts Three and Ten fulfill the requirement of two predicate acts for Nieto.

Hernandez was charged with aggravated robbery for robbing Castrejon in Racketeering Act Nine. Calderon testified that he and Almanza had already robbed Castrejon once, and he testified that they returned, this time with Hernandez, and robbed Castrejon a second time. Castrejon's testimony corroborated many of the details in Calderon's testimony, though he could not identify the robbers due to blood running down his face. Flores testified she drove the three, including Hernandez, to and from the robbery. Together, this testimony establishes the conviction was based on sufficient evidence.

Nieto and Hernandez were charged with conspiracy to possess with intent to distribute drugs in Racketeering Act Ten. Count 3 is based on the same offense, so we address the sufficiency of the evidence for the two charges together as they relate to Nieto and Hernandez. To prove Count 3, the Government must prove conspiracy to possess controlled substances with intent to distribute in violation of 21 U.S.C. § 846. The Government must prove three elements: "(1) the existence of an agreement between two or more persons to violate narcotics laws, (2) knowledge of the conspiracy and intent to join it, and (3) voluntary participation in the conspiracy." *United States v. Turner*, 319 F.3d 716, 721 (5th Cir. 2003) (internal quotation marks omitted). "As long as it is not factually insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the government in exchange for non-prosecution of leniency, may be constitutionally sufficient evidence to convict." *Id.* (internal quotation marks omitted). Furthermore, where, as here, "[t]he contours of a conspiracy . . . wholly overlap those of the enterprise[,] . . . the racketeering activity of a co-conspirator may well be sufficiently connected to the enterprise to violate RICO." *United States v. Erwin*, 793 F.2d 656, 671 (5th Cir. 1986).

No. 12-50500

There was sufficient evidence to establish both Nieto and Hernandez participated in the conspiracy in furtherance of the Aztecas' goals.  First, as discussed above, many witnesses testified about the existence of the Aztecas as an organization that deals drugs and about both Nieto's and Hernandez's willing memberships.  As to participation, in addition to the predicate acts discussed above—robbing rival drug dealers as part of the effort to maintain the Aztecas' monopoly over the drug trade—Barboza-Rodriguez, a co-conspirator and member of the Aztecas, testified that Nieto and Hernandez assaulted him as part of the enforcement of the Aztecas' objectives.  Because Barboza-Rodriguez was dealing drugs with a rival gang, Nieto participated in assaulting him the first time, and because the Aztecas suspected Barboza-Rodriguez was helping law enforcement, both Nieto and Hernandez assaulted him the second time.  This testimony "is not factually insubstantial or incredible," and even though Barboza-Rodriguez chose "to cooperate with the government in exchange for non-prosecution of leniency," his testimony is sufficient to support the convictions. *Turner*, 319 F.3d at 721 (internal quotation marks omitted).  In addition, Hernandez was present at Almanza's sister's house when law enforcement conducted a search and found the shotgun that was stolen from the robbery of Castrejon.  Together, this evidence is sufficient for a rational jury to convict Nieto and Hernandez on Racketeering Act Ten and Count 3.

To prove Count 2, conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d), the Government must prove the defendants simply conspired to violate § 1962(c), and no more.  18 U.S.C. 1962(d).  In considering § 1962(d), the Supreme Court said the following in *Salinas v. United States*:

> There is no requirement of some overt act or specific act in the statute before us, unlike the general conspiracy provision applicable to federal crimes, which requires that at least one of the conspirators have committed an "act to effect the object of the

12

conspiracy." § 371. The RICO conspiracy provision, then, is even more comprehensive than the general conspiracy offense in § 371.

. . . .

A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other. If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators. As Justice Holmes observed: "[P]lainly a person may conspire for the commission of a crime by a third person." *United States v. Holte*, 236 U.S. 140, 144, 35 S. Ct. 271, 272, 59 L. Ed. 504 (1915).

522 U.S. at 63–64 (alteration in original) (internal citations and quotation omitted). This circuit has required the Government to establish two factors: "(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense. These elements may be established by circumstantial evidence." *Delgado*, 401 F.3d at 296 (citation omitted). Thus, the second count requires sufficient evidence, direct or circumstantial, to prove each defendant agreed to "pursue the same criminal objective" even if taking on different roles within the organization. *Salinas*, 522 U.S. at 63.

For the same reasons recounted in support of the Count 1 convictions, Nieto and Hernandez's challenge to Count 2, conspiracy to commit racketeering, lacks merit. Many witnesses testified about the memberships of Nieto and Hernandez in the Aztecas and the practices of the Aztecas in dealing drugs, robbing rival drug dealers, and committing violence against out-of-line members. A rational jury could find Nieto's and Hernandez's predicate acts, which conform with the enforcement side of the Aztecas' business, and memberships in the Aztecas establish they conspired to commit racketeering and agreed to the overall objectives of the Aztecas.

No. 12-50500

In addition, Nieto asserts venue was improper because the drug purchases alleged in Racketeering Act Ten and Count 3 occurred in Dallas (located in the Northern District of Texas), not the Western District of Texas. This contention is probably waived for failure to brief, *United States v. Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010), but in any case lacks merit because the conspiracy was centered in the Western District. 18 U.S.C. § 3237(a). Accordingly, we hold there was sufficient evidence to convict Nieto and Hernandez on all three counts and venue was proper.

## III

Appellants challenge the district court's denial of their motions for a mistrial. We review "the denial of a mistrial for abuse of discretion." *United States v. Elashyi*, 554 F.3d 480, 507 (5th Cir. 2008). "The decision to declare a mistrial is left to the sound discretion of the judge . . . and . . . is appropriate when there is a high degree of necessity." *Renico v. Lett*, 559 U.S. 766, 130 S. Ct. 1855, 1863 (2010) (internal quotation marks and citations omitted). "The decision whether to grant a mistrial is reserved to the broad discretion of the trial judge, a point that has been consistently reiterated in decisions of this Court." *Id.* (internal quotation marks and citations omitted).

Appellants assert the district court erred by conducting the ex parte interviews, which they allege is a per se error, and by denying the motions for a mistrial on the merits. They rely on cases requiring defendants be present at proceedings determining the partiality of jurors, *Remmer v. Unites States*, 347 U.S. 227 (1954) and *United States v. Sylvester*, 143 F.3d 923 (5th Cir. 1998). Those cases did not involve a situation where defense counsel agreed to the ex parte procedure; quite the contrary, defense counsel in those cases was wholly unaware of the district court's investigation. *Remmer*, 347 U.S. at 228 (district court ordered FBI to investigate without advising defense counsel, who learned of the investigation in the newspaper); *Sylvester*, 143 F.3d at 932 ("Neither

14

defense counsel nor the government was present during these meetings [with the district court] or had been notified of the alleged tampering or the voir dire."). Moreover, those cases were explicitly concerned with the effects of *jury tampering* by third parties, not the subjective feelings of jurors. *Remmer*, 347 U.S. at 228 (involving attempted bribery); *Sylvester*, 143 F.3d at 931–32 (involving threatening phone calls and attempts of a third party to persuade a juror). Our precedent "speaks in terms of extrinsic influences such as trial publicity versus intrinsic influences such as a juror announcing that he had determined the defendant was guilty prior to the end of the trial." *United States v. Sotelo*, 97 F.3d 782, 796 (5th Cir. 1996) (citation omitted). "This circuit has afforded trial courts broader discretion in dealing with intrinsic influences due to jury misconduct than it has afforded in cases of extrinsic influences and has specifically declined to presume prejudice from intrinsic influences because it would hamper the judge's discretion." *Id.* "[R]egardless of the extrinsic/intrinsic classification, the trial court has broad discretion and the ultimate inquiry is: 'Did the intrusion affect the jury's deliberations and thereby its verdict?'" *Id.* at 797 (quoting *United States v. Ramos*, 71 F.3d 1150, 1154 (5th Cir. 1995)).

Contrary to the defendants' unsupported assertion that the influence here was "decidedly extrinsic," only the actions of Juror D.D.'s husband can arguably be characterized as extrinsic. The rest of the issues defendants challenge are intrinsic, such as the claim that jurors had made up their minds prior to deliberations. *See Sotelo*, 97 F.3d at 796. Biases are generally "described as an intrinsic influence." *Id.* at 797 (addressing racial bias).[1] This circuit has never held conducting ex parte interviews with the acquiescence of counsel to evaluate

---

[1] The *Sotelo* court distinguished an Eleventh Circuit case that held a trial court judge abused his discretion by not granting a mistrial on the basis of racial bias *not* because that trial judge had conducted his juror interviews ex parte, but rather on the basis of the degree and kind of racial bias that was present. *Sotelo*, 97 F.3d at 797 (distinguishing *United States v. Heller*, 785 F.2d 1524 (11th Cir. 1986)).

intrinsic influence is per se error, and we decline to do so now. *See United States v. Reyes*, 645 F.2d 285, 288 (5th Cir. Unit A May 1981).

Appellants take issue with the fact that several jurors expressed anxiety about the case and stated they had, to an extent, talked about the case, and that two indicated they had formed some opinions even though the interviews occurred before closing arguments. The district court has broad discretion to decide matters of impartiality generally, and that discretion is especially broad in matters of intrinsic influence. *Id.* at 796. In *United States v. Ebron*, this circuit "emphasize[d] that a district court, based on its unique perspective at the scene, is in a far superior position than we are to appropriately consider allegations of juror misconduct, both during trial and during deliberations." 683 F.3d 105, 126 (5th Cir. 2012) (alterations omitted) (quoting *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006)); *see also United States v. Ruggiero*, 56 F.3d 647, 653 (5th Cir. 1995) ("an appellate court should accord great weight to the trial court's finding that the extrinsic evidence in no way interfered with any juror's decision.") (internal quotation marks and alterations omitted).

The district court's broad discretion counsels against holding the district court abused its discretion in this case. The only juror with extrinsic influence, Juror D.D., was dismissed without objection, and the district court made a reasonable factual determination from its unique perspective that the remaining jurors could decide the case impartially. *United States v. Reyes* involved similar circumstances, including an out-of-court incident that involved only two jurors but was talked about among the remaining jurors. 645 F.2d at 288. The trial judge interviewed each juror individually, dismissed only the two involved, and decided the rest (including two alternates he interviewed) were not influenced by the incident and could follow his instructions. *Id.* As in the case *sub judice*, "[t]his procedure was followed with the express acquiescence of counsel." *Id.* The defendant contended the trial judge should have declared a mistrial *sua*

No. 12-50500

*sponte*, but *Reyes* held the trial judge did not err under an abuse of discretion standard because the procedures he followed were "well within" his discretion. *Id.*

Here, the district court instructed the jurors to decide the case based on the evidence and law, and "jurors are presumed to follow the instructions given to them by the court." *United States v. Owens*, 683 F.3d 93, 104 (5th Cir. 2012). Though the jurors indicated some anxiety and intrinsic misconduct to the judge, with the possible exception of Juror D.D., none were so extreme that the district court's judgment should be considered an abuse of discretion. Accordingly, we hold the district court did not abuse its discretion in denying the defendants' motions for a mistrial.

## IV

Nieto appeals his sentence on various grounds. We review sentencing for significant procedural errors first, including whether the district court "select[ed] a sentence based on clearly erroneous facts." *Gall v. United States*, 552 U.S. 38, 51 (2007). "When there are no procedural errors, this court will then 'consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard' and will 'take into account the totality of the circumstances.'" *United States v. Rodriguez*, 660 F.3d 231, 233 (5th Cir. 2011) (quoting *Gall*, 552 U.S. at 51). Reasonableness is reviewed in light of the 18 U.S.C. § 3553(a) factors. *United States v. Booker*, 543 U.S. 220, 261 (2005). We review a district court's interpretation of the Sentencing Guidelines de novo and its factual findings for clear error. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008).

Nieto asserts the district court should not have sentenced him as a career offender because one of his prior convictions, the one for Injury to a Child in violation of Texas Penal Code § 22.04(a), does not constitute a "crime of violence" under the last clause of Sentencing Guideline § 4B1.2(a)(2), known as the

17

residual clause. U.S. SENTENCING GUIDELINES MANUAL § 4B1.2(a)(2) (2011). When determining whether a prior conviction is for a "crime of violence" for purposes of the career offender enhancement under the residual clause, "we follow essentially the 'modified categorical approach,' adapted from *Shepard v. United States* . . . under which this court analyzes the nature of the crime described by the statute rather than the underlying facts of the offense when considering the residual clause." *United States v. Stoker*, 706 F.3d 643, 649 (5th Cir. 2013) (citing *Shepard v. United States*, 544 U.S. 13, 20–26 (2005)). We use this approach to determine whether the crime "involves conduct that presents a serious potential risk of physical injury to another." *United States v. Moore*, 635 F.3d 774, 776 (5th Cir. 2011). "'[C]onduct set forth (*i.e.*, expressly charged) in the count of which the defendant was convicted' may be used to apply the residual clause." *Stoker*, 706 F.3d at 650 (quoting *United States v. Lipscomb*, 619 F.3d 474, 478 (5th Cir. 2011)).

Nieto cites to *United States v. Andino-Ortega* as authority for the proposition that § 22.04(a) cannot be considered a "crime of violence," though that case dealt with § 2L1.2, not § 4B1.2(a). 608 F.3d 305, 310 (5th Cir. 2010). In *Andino-Ortega*, this circuit held a prior conviction under Texas Penal Code § 22.04 did not constitute a "crime of violence" for purposes of Sentencing Guideline § 2L1.2, which does not contain a residual clause, but rather requires physical injury to be an element of the statute of conviction. *Id*. at 311. In that case, the indictment charged the defendant with "intentionally and knowingly caus[ing] bodily injury to . . . a child younger than 15 years of age, by striking her with a weedeater." *Id*. at 310. *Andino-Ortega* held that when pared down, the statute proscribed causing "bodily injury," but that could be caused by ways other than physical violence. *Id*. at 311 ("For instance, an offense under § 22.04 can be committed by intentional act without the use of physical force by putting poison or another harmful substance in a child's food or drink."). Therefore,

No. 12-50500

*Andino-Ortega* held the prior conviction was not for a "crime of violence" because physical violence was not an element of the statute, *id.*, but the court did not have occasion to ask whether the crime involved serious potential risk of physical injury. *See Moore*, 635 F.3d at 776.

Nieto may be correct insofar as his crime may not be encompassed by the clause of § 4B1.2(a) concerned with elements of a crime, but he is mistaken in his assertion that the pared-down statute does not constitute a "crime of violence" under the *residual* clause of § 4B1.2(a), which asks whether the crime "involves conduct that presents a serious potential risk of physical injury to another." *Moore*, 635 F.3d at 776. Nieto's indictment charged him with "intentionally and knowingly caus[ing] bodily injury to . . . a child 14 years of age or younger, by striking and hitting the [child] with his hand." This indictment pares down § 22.04(a) to "intentionally [or] knowingly . . . by act . . . causes to a child . . . bodily injury." TEX. PENAL CODE ANN. § 22.04(a). Because the pared-down statute "involves conduct that presents a serious potential risk of injury to another," *Moore*, 635 F.3d at 776, the district court did not err in sentencing Nieto as a career offender.

Nieto asserts the district court erred in attributing 8 kilograms of cocaine and 300 pounds of marijuana to him for sentencing purposes. He uses the same arguments raised above in his sufficiency of the evidence challenge: in short, he asserts there is insufficient evidence that he was involved in the drug trafficking alleged in Count 3. Factual findings in sentencing are reviewed for clear error, and since there was sufficient evidence to convict Nieto for his role in the trafficking of these drugs, *see* Part II, *supra*, it was not clear error for the district court to find Nieto was involved in the conspiracy to distribute them.

Nieto asserts the district court made erroneous factual determinations that resulted in several enhancements and deprived him of reductions for: (1) having a minor role in the Aztecas; (2) causing bodily injury; (3) stealing

19

No. 12-50500

controlled substances or firearms; and (4) using or threatening violence. As an initial matter, Nieto "does nothing beyond listing . . . points of error [and] offers no further arguments or explanation," *Reagan*, 596 F.3d at 254–55, so these arguments are waived. Even if not waived, however, Nieto does not allege anything that could overcome the high barrier of clear error on the part of the district court. The district court could have easily found Nieto had more than a minor role because he was involved in the enforcement of Aztecas policies by robbing rivals or Aztecas working with rivals, such as Avila and Barboza-Rodriguez. On the issues of bodily injury and use of violence, Rodriguez testified to violence used against her in the robbery under Racketeering Act Four and Barboza-Rodriguez testified that Nieto assaulted him twice. Nieto also robbed drug dealers, at a minimum Avila, of their drugs. Therefore, the district court did not clearly err in making these factual determinations.

Lastly, Nieto contends his sentences (for concurrent 360-month terms of imprisonment) are substantively unreasonable because there was insufficient evidence at trial and because Calderon received a substantially shorter sentence (for a 121-month term of imprisonment). Because Nieto's sentences are within his Guidelines range, they are entitled to a rebuttable presumption of reasonableness. *Rodriguez*, 660 F. 3d at 233. Both of Nieto's contentions lack merit. First, there was sufficient evidence at trial for Nieto's convictions. *See* Part II, *supra.* Second, Calderon's shorter sentence is inapposite because, unlike Nieto, he cooperated with the Government. *See* 18 U.S.C. § 3553(e).

Accordingly, the district court did not err in sentencing Nieto.

## V

For these reasons, we AFFIRM.

20