# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-60661

United States Court of Appeals
Fifth Circuit

**FILED**
May 1, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ANN JEFFERSON,

Defendant – Appellant,

Appeal from the United States District Court
for the Northern District of Mississippi

Before STEWART, Chief Judge, and HIGGINBOTHAM and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Following a jury trial, defendant Ann Jefferson was convicted of embezzling government funds, witness tampering, and several other offenses related to her work at a Mississippi housing authority. Jefferson appeals her conviction and sentence of thirty-two months imprisonment, and raises claims regarding: (1) the denial of her motion for a mistrial following the admission into evidence of a tape-recorded conversation at trial; (2) the sufficiency of the evidence in support of each of her convictions; (3) the location of her trial; and (4) the reasonableness of her sentence. We AFFIRM.

No. 12-60661

I.

The South Delta Regional Housing Authority ("SDRHA") was created to provide affordable housing to low-income families in the Mississippi Delta, one of the poorest regions in the nation.[1]  SDRHA purchases homes and then resells or rents those homes to low-income individuals at below-market rates. It receives federal funds from the United States Department of Housing & Urban Development ("HUD")[2] and is governed by a Board of Commissioners and an Executive Director.  Starting in 2006, Jefferson worked as Executive Director of SDRHA and in that capacity was responsible for its HUD and non-HUD programs.

On May 28, 2009, Jefferson asked SDRHA employee Nikki Wuestenhoefer to compile a report showing the amounts SDRHA's non-HUD tenants were paying in monthly rent.  After Wuestenhoefer presented the report to Jefferson the next day on May 29, Jefferson called a meeting ("the May 29 meeting") and announced that SDRHA would substantially raise its rental rates, more than doubling and in one instance quadrupling them.[3]

Thereafter, in a separate suit from this appeal, over 200 SDRHA tenants filed suit in the Northern District of Mississippi asking the court to enjoin the rate increases.  The court subsequently conducted a preliminary injunction hearing, during which Jefferson testified that SDRHA was in financial chaos

---

[1] We recite the facts based on the evidence presented at trial in the light most favorable to the jury's verdict, as we must. *See United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010).

[2] The parties stipulated at trial that SDRHA receives millions of dollars in federal funding from HUD and that at all times applicable to the indictment those federal funds were commingled with its non-HUD funds.

[3] One-bedroom leases increased from $60 to $240, two-bedroom leases from $120 to $320, three-bedroom leases from $180 to $400, four-bedroom leases from $240 to $520, and five-bedroom leases from $300 to $640.

2

when she took over and that without the rate increases SDRHA's housing program would fail due to lack of funds.  Jefferson further stated that she and her staff had reviewed the tenants' files and verified that they could afford the rate increases based on the income information in their files.  Based on Jefferson's testimony, the Northern District of Mississippi denied the plaintiffs' request for a preliminary injunction and permitted the rate increases to take effect.  Roughly sixty families lost their homes around Christmastime as a result.

A subsequent investigation into the rent increases revealed that SDRHA's staff had not reviewed the tenants' files to make sure that they could pay the new rates.  SDRHA's property manager, Angela Brady, had attended the May 29 meeting and said that those present were in shock when they heard Jefferson announce the new rates and did not know where they had come from.  Regarding SDRHA's financial situation, minutes from the meetings of SDRHA's Board of Commissioners showed that Jefferson repeatedly assured the Board that SDRHA was financially stable, stating at one point that SDRHA had "a couple of million-dollar CDs in the bank to show that the agency is definitely financially stable."  Jefferson subsequently bragged to Wuestenhoefer about "lying to the court" and "would often boast about playing the judge and jury," in reference to the preliminary injunction hearing.

In 2010, the year following the rent increases, Jefferson received $195,399 in compensation.  SDRHA also agreed to allow Jefferson to purchase one of its homes, located at 301 Huddleston Street in Leland, Mississippi (the "Huddleston property"), for $62,500.  SDRHA loaned Jefferson the money to purchase the Huddleston property, which included $20,000 that was deposited directly into Jefferson's bank account for use in renovating the property to suit her needs.

No. 12-60661

According to Brady, Jefferson never used the $20,000 to renovate the Huddleston property but instead diverted SDRHA funds to lavishly remodel the property.  Brady saw a number of requisition and purchase orders that, while purporting to permit renovations at various SDRHA properties, actually reflected renovations at the Huddleston property.  For example, SDRHA paid $4,200 for the renovation of a garage at the Huddleston property; however, the invoice incorrectly reflected that the work was performed at a different address, which never had a garage.

Brady identified other incorrectly invoiced renovations to the Huddleston property, including the installation of a patio, Jacuzzi tub, and appliances such as a refrigerator, range, dishwasher, and a washer and dryer. The receipts and requisition orders for several renovations bore Jefferson's signature and on others the address was blacked out.  Dinnial Love, SDRHA's maintenance supervisor, purchased and installed a number of items at the Huddleston property, which he described as "high dollar" and more expensive than those typically installed in SDRHA homes.  SDRHA also paid $4,775 for cabinets, $7,200 for roofing, $7,500 for an air-conditioning unit, and $5,000 for plumbing work at the Huddleston property.

Jefferson's co-defendant, Jimmy Johnson, contracted with SDRHA to remove concrete debris and to perform dirt work at one of SDRHA's properties. He performed that work, for which SDRHA paid him $30,000.  Thereafter, however, Johnson entered into another $10,000 contract with SDRHA to perform the same work, i.e., work that had already been completed.  On that $10,000 contract, SDRHA paid Johnson an initial draw of $5,500, which he later admitted was actually for work he performed at Jefferson's Huddleston property.  The remaining $4,500 was part of a check that Brady and Johnson cashed together at a pawn shop and then returned to Jefferson. Upon receiving the $4,500, Jefferson said that Johnson owed her the other $5,500.

4

No. 12-60661

The FBI subsequently initiated an investigation into Jefferson's conduct and sought the cooperation of SDRHA employees Brady and Wuestenhoefer, and SDRHA tenant Melanie Gentry. According to Brady, the content of her potential responses to the FBI were a "daily conversation" with Jefferson. Jefferson told her not to be truthful and their discussions included Jefferson "coaching and telling [Brady] what to say . . . telling [her] what not to say." In a discussion regarding Brady's upcoming appearance before the grand jury, Jefferson was tape-recorded telling Brady that the $4,500 returned to her on the $10,000 Johnson contract would never come up because only the three of them knew about it. Jefferson told Brady that she should say "no," if they asked her about going to Johnson's house and that they all needed to have the same story.

Jefferson also made various statements to SDRHA employees indicating that anyone who cooperated with the FBI's investigation would be fired and that she was going to "clean house" after the FBI left. Upon learning that Wuestenhoefer was cooperating with the FBI, Jefferson was described as "furious and she said that she was going to get her" and "fire her a--." Jefferson took job duties away from Wuestenhoefer and made it difficult for her to complete her work by limiting her access to computer systems and by requiring an escort to accompany her in certain areas of the building, including the restroom. Jefferson taunted Wuestenhoefer, instructed other employees not to talk to her, called her a "snitch" and made other derogatory comments on a daily basis, was recorded saying "we are going to . . . blame everything on [Wuestenhoefer]," and told others that she was going to fire Wuestenhoefer after the conclusion of the FBI investigation. The Board of Commissioners eventually terminated Wuestenhoefer.

Brady experienced similar treatment, even though she had previously worked closely with Jefferson. After it became known that Brady was

cooperating with the FBI, Jefferson took Brady's keys and phone, had her locked out of SDRHA computer systems and moved to a separate office, and instructed other employees not to talk to her. The effect of these actions left Brady unable to perform her work, and Brady subsequently experienced problems with too much money being deducted from her paychecks.

Gentry was a third-generation SDRHA tenant. Following the rate increases Jefferson imposed, Gentry's monthly rent increased from $250 to $520. Wuestenhoefer, who recognized that Gentry could not afford the increased payments, allowed her to continue paying $300 a month rather than $520. Gentry did so, giving her September 2010 rent payment to Wuestenhoefer in the form of a money order. Thereafter, Jefferson contacted Gentry and informed her that the money order was missing, that no September rent payment had posted, and that she would have to pay $1,650 to resolve her account. Jefferson further informed Gentry that Wuestenhoefer must have taken the money order and that she would wipe Gentry's $1,650 delinquent account clean if she would write a letter stating that Wuestenhoefer did so. Under pressure of losing her home, Gentry eventually signed a letter to that effect. With her account written off, Gentry was able to purchase her home from SDRHA, which she did.

A month after closing on her home, Gentry met with several members of the Board of Commissioners. She explained that Jefferson had asked her to accuse Wuestenhoefer and that she in fact did not believe Wuestenhoefer had stolen her money order. The following week, Jefferson called Gentry and stated that SDRHA was foreclosing on her home. At that time, Gentry had not yet received a coupon book to pay her mortgage. Jefferson stated that the foreclosure was the result of Gentry falsifying her application and failing to provide proof of insurance. In fact, Gentry had faxed proof of insurance to SDRHA and had not filled out an application. Gentry subsequently attempted

to deliver proof of insurance to Jefferson in person, but Jefferson refused to accept it.

On July 28, 2011, a grand jury returned an indictment charging Jefferson with two counts of embezzlement of government funds in violation of 18 U.S.C. § 641 ("Counts One and Four"), one count of witness tampering in violation of 18 U.S.C. § 1512(b)(2)(A) ("Count Two"), one count of obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) ("Count Three"), one count of making a false statement to the FBI in violation of 18 U.S.C. § 1001(a)(3) ("Count Five"), and three counts of retaliation against a witness in violation of 18 U.S.C. § 1513(e) ("Counts Seven, Eight, and Nine"). Jefferson pleaded not guilty and the case proceeded to trial, beginning on February 29, 2012.

After a five-day trial, the jury returned a verdict, finding Jefferson guilty of all counts except Count Five. Jefferson then filed a motion for judgment of acquittal or in the alternative for a new trial. The district court denied the motion and the case proceeded to sentencing.

At sentencing, Jefferson filed a number of written objections. After reviewing the objections and the government's response, the district court overruled Jefferson's objections, reasoning that they were mostly factual in nature. Accordingly, the district court sentenced Jefferson to thirty-two months of imprisonment, which was within the range provided by the Sentencing Guidelines.[4] Jefferson appeals her conviction and sentence.

---

[4] Based on a total offense level of nineteen and a criminal history category of I, the Sentencing Guidelines range was thirty to thirty-seven months of imprisonment.

No. 12-60661

## II.

### A.

Jefferson's first claim on appeal challenges the admission into evidence of a tape-recorded statement in which she stated that no jury would convict her of the charged offenses. "We review evidentiary rulings for abuse of discretion." *United States v. Heard*, 709 F.3d 413, 422 (5th Cir. 2013).

The jury heard the statement at issue in the context of a conversation Jefferson conducted with Brady and Patricia Logan, another SDRHA employee, discussing Wuestenhoefer's cooperation with the FBI's investigation. Jefferson told Brady and Logan that although the government might file charges she would ultimately be found innocent and the FBI would be "left out of it." This exchange immediately followed:

Jefferson: That mean I can come in here and do whatever the hell I want to do. I'm gon' clean house.

Logan: Now they couldn't prove their case.

Jefferson: They couldn't prove their case. 'Kay.

Logan: They couldn't prove it.

Jefferson: Now let me tell you another thing too . . .

Brady: What jury? Okay go ahead . . .

Jefferson: Oh yeah they gon' have to have a jury . . .

Logan: Yeah if they take it to court.

Jefferson: Let . . . let me tell you something . . .

Brady: Yeah but you . . . (UI)

Jefferson: A jury in . . . in Greenville. You understand what I'm sayin'?

Logan: Greenville? Ain't nowhere . . .

Jefferson: I'm tellin' you, there ain't a jury in the state of Mississippi will find a person guilty for this s--t. You understand what I'm sayin'? I don't care who they are. And the person might

8

. . . would they put on the stand . . . I would be the person.

And that . . . I would be the first and only.

After the jury heard the recording of this conversation, Jefferson moved for a mistrial, arguing that the recording was highly prejudicial. The district court denied Jefferson's motion.

On appeal, Jefferson argues that the district court abused its discretion by allowing the jury to hear her statement that no jury would convict her. She reasons that it was intended to inflame the jury's punitive instincts, that there was no probative reason for offering the statement, and that therefore the district court should have excluded it pursuant to Rule 403 of the Federal Rules of Evidence, which provides that relevant evidence should be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." In response, the government explains that the tape recording was pre-admitted by the parties as an exhibit before trial and that Jefferson did not object until after it was played in open court. In any event, the government argues that the statement was not unfairly prejudicial and that the recording was probative of Jefferson's intent to retaliate against Wuestenhoefer for cooperating with the FBI.

The district court did not err in refusing to grant a mistrial following the playing of the unobjected-to tape recording in court. Moreover, even assuming *arguendo* that Jefferson had made a timely objection to the evidence, the district court did not abuse its discretion by denying Jefferson's motion for a mistrial. *United States v. Nieto*, 721 F.3d 357, 369 (5th Cir. 2013). The tape recording was highly probative of Jefferson's intent to retaliate against SDRHA employees who cooperated with the FBI's investigation, and she was on trial for three counts of retaliation. To be sure, the recording may have prejudiced Jefferson, but as we have explained previously, "all probative evidence is by its very nature prejudicial." *United States v. Powers*, 168 F.3d

741, 749 (5th Cir. 1999).  We cannot say that any prejudice here outweighed—much less *substantially* outweighed—the highly probative value of the recording.  *See United States v. El-Mezain*, 664 F.3d 467, 508 (5th Cir. 2011).[5]

## B.

In her second claim on appeal, Jefferson argues that there was insufficient evidence to support her conviction on each count.  Jefferson does not challenge any particular element of each count, but instead challenges each generally.  "Sufficiency of the evidence challenges are reviewed de novo." *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014).  We must determine whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Moreno–Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011).  In doing so, we accept "'all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict.'"  *Id.*  "We will not second guess the jury in its choice of which witnesses to believe."  *United States v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994).

We conclude that the evidence was sufficient to support Jefferson's convictions on all counts.  As to the embezzlement counts (Counts One and Four), the evidence presented against Jefferson at trial was overwhelming. Johnson, Jefferson's co-defendant, testified that they embezzled government funds by creating a fraudulent $10,000 contract for work that had already been completed.  Brady corroborated Johnson's testimony—she helped Johnson cash a check written on the contract at a pawn shop and returned the funds to

---

[5] Jefferson also argues that the admission of her statements violated her First Amendment rights because her statements did not constitute unprotected speech under *Brandenburg v. Ohio*, 395 U.S. 444 (1969).  Jefferson's argument has no merit, as "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."  *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).

Jefferson. Testimony and exhibits at trial established that SDRHA repeatedly, at Jefferson's direction, paid for renovations at her Huddleston property, many of which were incorrectly invoiced to other properties. The receipts and requisition orders for a number of these renovations bore Jefferson's signature. *See* 18 U.S.C. § 641 (prescribing punishment for an individual who "knowingly convert to his use . . . money, or [a] thing of value of the United States").

Jefferson's challenge to her witness tampering count (Count Two) fares no better. Brady testified that the content of her potential responses to the FBI's investigation were a "daily conversation" with Jefferson, that such conversations included "coaching and telling [her] what to say . . . telling [her] what not to say," and that Jefferson told her not to be truthful. Jefferson told Brady not to mention ever having visited Johnson's house to deliver the check on the falsified $10,000 contract. *See* 18 U.S.C. § 1512(b)(2)(A) (prescribing punishment for anyone who attempts to "corruptly persuade[] another person" to withhold testimony).

The evidence also supported a conviction on the count charging Jefferson with obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) (Count Three). Several lines of evidence supported the fact that Jefferson intentionally misled the Northern District of Mississippi in the preliminary injunction hearing in the suit filed by SDRHA tenants to enjoin Jefferson's rent increases. These included testimony from Brady, who testified that Jefferson had misrepresented the basis of the rent increases, and minutes from meetings of SDRHA's Board of Commissioners wherein she repeatedly stated that SDRHA was financially stable, contrary to what she represented in the preliminary injunction hearing. The jury also heard a tape recording of Jefferson bragging about lying to the court.

Finally, the evidence supported a conviction on the retaliation counts (Counts Seven, Eight, and Nine). The text of 18 U.S.C. § 1513(e) prescribes

punishment for anyone who "knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person," for providing truthful information in relation to a federal offense.  The evidence at trial showed that Jefferson did so.   Jefferson drastically altered the work environments of Brady and Wuestenhoefer and without apparent basis threatened to foreclose on Gentry's home.  It was not irrational for the jury to conclude that these actions were taken with retaliatory motive—indeed, Jefferson told others that she would do so, or in her words "clean house."  *See Moreno–Gonzalez*, 662 F.3d at 372.

## C.

In her third claim on appeal, Jefferson argues in two sentences that the district court should have sequestered the jury or changed the trial venue due to negative media coverage surrounding the trial.  Jefferson did not raise this issue below; therefore we review for plain error.  *See* Fed. R. Crim. P. 52. "Under plain error review, we will reverse only where there was (1) an error, (2) that was clear and obvious, (3) that affected the defendant's substantial rights, and (4) that, if not corrected, would seriously affect the fairness, integrity, or public reputation of the judicial proceedings."  *United States v. Reagan*, 725 F.3d 471, 483 (5th Cir. 2013).

Even assuming *arguendo* that Jefferson's claim is adequately briefed, she has not shown that relief is warranted under plain error review.  Other than a bald assertion of negative media coverage, Jefferson has identified no evidence suggesting that her trial was unfair or that its location affected her substantial rights.[6]   *See id.*; Fed. R. Crim. P. 21 (stating that a district court

---

[6] Jefferson incorrectly states that the district court allowed the case to be tried in Greenville, Mississippi.  It was in fact held across the state in Aberdeen.  The government acknowledges that there was media coverage of Jefferson's trial in the Greenville area, where

must transfer the trial to another district if it "is satisfied that *so great a prejudice* against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there" (emphasis added)).

### D.

Finally, Jefferson challenges her within-Guidelines sentence of thirty-two months imprisonment.  In reviewing the reasonableness of a sentence, we "must first ensure that the district court committed no significant procedural error, such as failing to consider the § 3553(a) factors." *United States v. Kippers*, 685 F.3d 491, 497 (5th Cir. 2012).  Absent procedural error, we then consider the substantive reasonableness of the sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007).  "In this circuit, a sentence within the Guidelines range is presumed reasonable on appeal." *United States v. Mondragon–Santiago*, 564 F.3d 357, 360 (5th Cir. 2009).  Here, Jefferson argues that the district court should have considered the factors set forth in 18 U.S.C. § 3553(a) at sentencing and also should have granted a downward departure for aberrant behavior.  We disagree with both arguments and therefore affirm her conviction.

To begin with, the record reflects that the district court did in fact consider the § 3553(a) factors when fashioning Jefferson's sentence.  The sentencing judge explained that he had presided over the trial, heard all of the testimony, and considered the Guidelines range and sentencing factors enumerated in 18 U.S.C. § 3553(a) to determine the appropriate sentence. Moreover, in the event of a properly calculated within-Guidelines sentence, which Jefferson received, "we will infer that the judge has considered all the

---

Jefferson lived and worked, but argues that holding the trial in Aberdeen cured any prejudicial effect the media coverage may have had.

factors for a fair sentence set forth in the Guidelines." *United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005).

With regard to Jefferson's argument that the district court should have granted a downward departure, we lack jurisdiction. "We have jurisdiction to review a district court's decision not to depart downward from the guideline range only if the district court based its decision upon an erroneous belief that it lacked the authority to depart." *United States v. Alaniz*, 726 F.3d 586, 627 (5th Cir. 2013). Nothing in the record here suggests that the district court held such a belief; therefore, we reject Jefferson's argument and do not reach its merits.[7] *See id.*

### III.

For the foregoing reasons, we AFFIRM Jefferson's conviction and sentence.

---

[7] Jefferson argues that during discovery the government did not disclose potentially exculpatory evidence, in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and any agreements in relation to witnesses' testimony, in violation of its obligations under *Giglio v. United States*, 405 U.S. 150 (1972). Jefferson's conclusory assertion of unspecified *Brady* and *Giglio* violations is inadequately briefed and we therefore decline to review it. *See, e.g.*, *Scroggins*, 599 F.3d at 447 ("It is not enough to merely mention or allude to a legal theory." (citation and internal quotation marks omitted)); *see also* Fed. R. App. P. 28.

We likewise do not consider Jefferson's argument that her defense counsel was ineffective because his law firm also represented SDRHA's Board of Commissioners at the same time he represented her. "'Sixth Amendment claims of ineffective assistance of counsel should not be litigated on direct appeal, unless they were previously presented to the trial court.'" *United States v. Isgar*, 739 F.3d 829, 841 (5th Cir. 2014) (quoting *United States v. Aguilar*, 503 F.3d 431, 436 (5th Cir. 2007)). Jefferson did not raise an ineffective-assistance-of-counsel claim with the district court, nor is the record sufficiently developed for us to review her claim. *See id.* We therefore deny her claim without prejudice to collateral review.